COMMONWEALTH *vs.* LAWRENCE KENNEALLY.

Barnstable. March 12, 1980. — July 1, 1980.

Present: HALE, C.J., GRANT, & NOLAN, JJ.

*Larceny. False Pretenses. Embezzlement. Search and Seizure. Practice, Criminal,* Instructions to jury, Disclosure of statements by defendant, Severance. *Evidence,* Hearsay, Police report.

Evidence that an insurance agent had on two occasions sent a salesman to the home of an elderly woman with instructions to obtain cashier's checks from her, that the agent had then given the salesman half of the proceeds from each check, and that, after being questioned by police with respect to the transactions, the agent had made out and backdated an application for an annuity in the woman's name, taken together with incriminating statements made by the agent to the salesman, warranted a finding that the agent had committed larceny with respect to the two checks. [165-166]

Evidence that an insurance agent had obtained from an elderly woman a check in an amount greater than the total premiums due on three policies, taken together with certain incriminating statements made by the agent and evidence of the agent's criminal conduct in connection with the sale of other insurance to the woman, was sufficient to warrant a finding that the agent had committed larceny with respect to the overcharge. [166-167]

Evidence that an insurance agent had obtained from an elderly woman a check in an amount greater than the total premiums due on three policies was insufficient to warrant a finding that the agent had committed larceny where there was no evidence other than proximity in time to link the policies and the check [167]; nor was evidence that one of the policy applications was cancelled and the premium check for it returned sufficient to warrant a finding of guilt where there was no evidence that the agent had retained the check rather than returning it to the woman [168].

Evidence that an insurance agent obtained a check from an applicant for an annuity contract, that two months later the agent sent an altered application to the insurance company with a check in an amount one twelfth of what he had received from the applicant, and that he subsequently submitted a bad check for the balance was sufficient to warrant a finding that the agent had committed larceny with respect to the applicant's check. [168-169]

Evidence that an insurance agent obtained from an insured checks in an amount greater than what was due on two policies of insurance and that, after the agent became aware of police investigation of his business several months later, he caused another policy to be issued to the insured with a premium amount approximating the excess from the insured's checks for the first two policies warranted a finding that the agent had committed larceny with respect to the two checks. [169-170]

Evidence that an insurance agent had obtained from an elderly woman a check in an amount greater than premiums due on two policies and that he later divided the excess with a salesman and told him the excess represented an application fee which he had added to the policies without the woman's knowledge warranted a finding that the agent had committed larceny with respect to the overcharge. [170]

Evidence that an insurance agent had obtained from an applicant for medical insurance a check for a quarterly premium on a policy, that the applicant never received a policy, and that the insurance company had never received an application for the policy, taken together with evidence of the agent's criminal conduct in connection with the sale of other insurance, warranted a finding that the agent had committed larceny by false pretenses with respect to the check. [170-171]

Evidence that an insurance agent obtained a check from a mother for the annual premiums on annuities for her two daughters and that the agent subsequently sent the insurance company payments for only six-month premiums warranted a finding that the agent had committed larceny from the two daughters with respect to the balance of the premium payments. [171-172]

A search warrant directing the seizure of all records and papers of an insurance agency was not an unconstitutional "general warrant." [172-173]

An affidavit in support of an application for a search warrant of an insurance agent's home, which stated that an investigation by the Division of Insurance had "resulted in serious allegations of criminal nature in regards to the [insurance agency] and its business transactions," including "[p]olicies paid for [which] were not received by the insureds and monies placed in the [agency] account," was sufficient to establish probable cause for the issuance of a warrant directing the seizure of all records and papers of the insurance agency. [173-175]

At the trial of an insurance agent charged with larceny, the judge erred in his instructions with respect to the elements of larceny by false pretenses. [175-177]

At a criminal trial, the judge erred in admitting in evidence a police report containing multilevel hearsay. [178-179]

At a criminal trial, the judge did not err in accepting the prosecutor's representation that he had supplied the defendant with all statements made by him and in refusing to conduct an in camera review of all the reports purportedly containing the defendant's statements. [179-180]

At the trial of an insurance agent on eleven indictments charging larceny of property, the judge did not abuse his discretion in denying the defendant's motion to sever the indictments. [180-181]

INDICTMENTS found and returned in the Superior Court on March 21, 1978.

The cases were tried before *Foster*, J., a Municipal Court judge sitting under statutory authority.

*John P. Courtney* (*Thomas J. Herbert* with him) for the defendant.

*John A. Mendlesohn*, Assistant Attorney General, for the Commonwealth.

HALE, C.J. The defendant was convicted on nine indictments charging larceny of property worth more than one hundred dollars and on two charging larceny of property worth less than one hundred dollars.[1] The defendant was the proprietor of Yankee Insurance Agency (Yankee). The indictments against him were based on a series of insurance transactions between March 10, 1977, and November 18, 1977. The defendant has claimed various errors in the trial, which we shall discuss below. We review first the denial of the defendant's motions for directed verdicts on all eleven indictments. We begin our discussion of each indictment by summarizing the evidence relevant to it in accordance with the principles stated in *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979).

The Commonwealth proceeded on the theory that the defendant had committed larceny by false pretenses, which requires proof (1) that a false statement of fact was made, (2) that the defendant knew or believed the statement to be false when he made it, (3) that the statement was made with the intent that the person to whom it was made should rely upon its truth, and (4) that that person did rely on it as true and parted with personal property as a result. *Commonwealth* v. *Leonard*, 352 Mass. 636, 644-645 (1967). The question as to each indictment is whether sufficient evidence was presented on those elements.

---

[1] Indictments 38478, 38480, 38482, 38483, 38486, 38488, 38491, 38493 and 38494 were for larceny of more than one hundred dollars; 38481 and 38490 charged larceny of less than one hundred dollars.

### INDICTMENTS 38478 AND 38480.

These two indictments charged larceny from Alice Booth on or about November 18, 1977, and October 20, 1977, respectively. Much of the evidence came from the testimony of one Vicino, who had worked for the defendant as an insurance salesman. On October 20 Vicino went to the home of Booth, who was seventy-nine years old at the time. He had been told by the defendant that Booth had written a check for $1,750, which had been returned for insufficient funds, and that he should obtain a cashier's check from her for that amount. Vicino took Booth to a bank, where she purchased a $1,750 check and turned it over to Vicino. He gave the check to the defendant, who gave him $875. No insurance application was filled out at that time.

Approximately one to one and one-half weeks later, the defendant telephoned Vicino and told him that it was "time to pick up another check" from Booth. The defendant said that "the State was going to get all her money so why shouldn't I get a piece of the action." When Vicino refused, the defendant told him that he "was in as deep as [the defendant] was." The defendant called him four or five times after that to encourage him to return to Booth's home. He told Vicino that Booth "wouldn't know one day from another" and that he had "nothing to worry about." The defendant then came to Vicino's home and told him to pick up the check. He again told Vicino that he "was in it as deep as [the defendant] was" and that Vicino had no choice. On November 18, 1977, Vicino again took Booth to the bank, where she purchased a check for $1,530. After Vicino gave the check to the defenddant, the defendant paid him $750.

In December the defendant and Vicino made out an application for an annuity showing a deposit in the amount of $1,750 from Booth. The application was dated October 19, 1977. The defendant told Vicino that he had been questioned by the Barnstable police, that there was supposed to be an application on file, and that the application they completed in December was to be "submitted." That application was later found in the defendant's file. After Vicino stopped working for the defendant in December, 1977, the defendant told him

that he, Vicino, was the one being sought by the police and that it appeared that he "was the brains behind the whole thing." The defendant suggested that Vicino leave the State.

Vicino's testimony, along with the various checks, deposit slips and applications introduced in evidence, provided ample support for a finding that the defendant had committed larceny from Booth on October 20, 1977, and on November 18, 1977. The incriminating statements made by the defendant to Vicino were evidence that he had formed an intent to steal from Booth before he sent Vicino to pick up the November 18 check. The jury could also have inferred from those statements that the defendant had intended to steal from Booth when he sent Vicino to pick up the October 20 check, and that his plan to provide the police with a backdated application was to hinder their investigation of his activities.

INDICTMENT 38481.

The following evidence was introduced to prove larceny from Alice Booth on August 23, 1977: applications dated April 18, 1977, for three policies to be issued by United American Insurance Company (United) to Booth, showing premiums paid to the defendant totalling $539.40; a deposit ticket dated April 20, 1977, found in the defendant's files, with a notation on its back, "597.00 Prem. to United American for Alice Booth"; and two checks issued by Booth to Yankee dated July 25, 1977, and August 18, 1977, each for $597.28. United received no application from Yankee for Booth dated April 18, 1977, other than the three that were in evidence. Although it is not clear what significance the prosecution ascribed to each of the checks dated July 25 and August 18, we need not consider them, as we are satisfied that the jury could have found that the defendant committed larceny of less than $100 by accepting applications for policies on April 18, 1977, the total premiums for which were $57.60 less than the $597.00 which his April 20 deposit ticket indicates he received from Booth. See *Commonwealth* v. *Schnackenberg*, 356 Mass. 65, 73-74 (1969). The inference that the overcharge was criminal is further supported by the statements later made by the defendant

to Vicino which we have discussed on indictments 38478 and 38480, and by the evidence introduced in those cases of the defendant's criminal conduct in connection with the sale of other insurance to Booth. See *Commonwealth* v. *Wilson*, 355 Mass. 441, 443 (1969). The defendant has made no argument that the indictment charging larceny on or about August 23, 1977, might not be supported by proof of a larceny in April, 1977, and we do not discuss that question. See *Commonwealth* v. *Corcoran*, 348 Mass. 437, 442 (1965).

## INDICTMENTS 38482 AND 38483.

These two identically worded indictments charge larceny from Booth on March 10, 1977. The evidence presented on one of these indictments (it is not clear which) consists of an approved application for a United policy for Booth with an annual premium of $362.17, dated March 4, 1977, and reciting that such a policy was issued March 15, 1977; an Academy Life Insurance Company (Academy) policy and a rider thereto with an aggregate annual premium of $317.90, issued March 5, 1977; an unapproved application for an American Fidelity Life Insurance Company (American) policy with a $1,200 annual premium, dated March 4, 1977; and a $2,200 check issued by Booth to Yankee dated March 4, 1977. The Commonwealth relied on that evidence as sufficient to prove larceny of the difference between the total of the premiums for the three policies ($1,880.07) and the amount of the Booth check ($2,200). There was no evidence other than proximity in time to link the policies and the check.[2] Thus, regardless of any fraudulent scheme which could have been found by the jury, the existence of any overcharge for these three premiums was purely conjectural. See *Commonwealth* v. *Louis Constr. Co.*, 343 Mass. 600, 606 (1962).

---

[2] Thus, the evidence presented on this indictment falls short of that presented on 38481. In 38481 a direct connection between the policies and the check introduced in evidence was provided by the deposit ticket, which listed an excessive payment by Booth for the three policies applied for on that day, and by the evidence that no other policy was issued to her by the insurance company referred to on the deposit ticket.

The other March 10 indictment arose from the same transaction in so far as the policy application to American was concerned. Here the prosecution relied on the additional evidence that that application had been cancelled before any policy was issued and that a $1,200 premium check written by the defendant which had accompanied the application had been returned to him by American. Even if it could have been found that Booth's $2,200 payment to the defendant was made on account of premiums which included the $1,200 one to American, there was no evidence that he committed larceny by false pretenses when he accepted that payment from Booth, and the fact that he apparently forwarded his own $1,200 check with the application cuts the other way. Nor was there sufficient evidence to support a conviction on an embezzlement theory. An officer of the bank in which the defendant maintained a checking acount, who testified at the trial that the defendant's $1,200 check to American had not been presented for payment, could have been asked if her records showed whether the defendant had issued a check to Booth when his $1,200 check was returned to him or whether he had later issued a check for a policy for Booth from a different company in the same amount. She was not so questioned, nor was any other evidence introduced which would have shown either payment to Booth of the money received or the absence of such payment. Thus, although the jury could have found from the other evidence of the defendant's scheme to defraud Booth that he had had the necessary intent to retain the $1,200 when his check was returned by American, there was no evidence that he did in fact retain it. The jury could not have found beyond a reasonable doubt that the defendant stole the $1,200. See *Commonwealth* v. *Latimore*, 378 Mass. at 677-678.

INDICTMENT 38488.

On August 4, 1977, Vicino sold an American annuity contract to one Basil Molony and received a $1,200 check from him. Vicino gave the check to the defendant, who deposited it. American received an application dated October 12, 1977, on which the $1,200 premium had been crossed out and a

monthly premium of $100 substituted. The defendant's check for $100 accompanied the application. On November 3, 1977, American received a note from the defendant asking that the policy be changed to an annual basis, asking that the effective date be changed to June 1, 1977, and stating that a $1,100 check was enclosed. American had on file a microfilm copy of a $1,100 check written to it by the defendant on October 31, 1977, with a notation showing Molony's policy number. The check was stamped "insufficient funds." The evidence that the defendant received $1,200 from Molony, that he waited nearly two months before submitting an altered application to American in an amount one-twelfth of what he had received from Molony, and that he later submitted the bad check for the remaining $1,100, supported a finding that at the time the defendant accepted Molony's money, he intended to and did keep $1,100 for his own use. The other occasions of the defendant's fraudulant sale of insurance proved at the trial lent further support for this conclusion. See *Commonwealth* v. *Edgerly,* 6 Mass. App. Ct. 241, 252 (1978). Taken as a whole, the evidence warranted a verdict of guilty on this indictment.


INDICTMENT 38486.


This indictment concerns two policies issued by Academy to Molony, one with an effective date of March 8, 1977, and one which bore March 23, 1977, as the date of issuance. The premiums for the two policies were $205.70 and $346.02, respectively. Index cards listing these two premiums as paid were found in the defendant's files. Molony testified that he gave Vicino a check for $251.75 on March 14, 1977, and a check for $530.20 on September 8, 1977; on the latter date, Vicino came solely to pick up the check. The indictment charged larceny on September 8, 1977, and the Commonwealth's position is that the larceny was for the $230.23 difference between the total of the premiums for the two policies and the total amount Molony paid the defendant. After the defendant became aware of police investigation of his business, Molony received an unsolicited United policy with an effective date of Janu-

ary 5, 1978, and a premium amount of $234.80. Molony testified that the signature on the application for the policy received by United was not his and that he had not applied for the policy. This evidence was admitted to show the defendant's consciousness of guilt through his belated attempt to furnish Molony insurance with a premium amount approximating the excess of the amount received over the total amount of the premiums on the two policies issued in March. This evidence warranted a finding that the checks were received by the defendant from Molony with the concurrent intent to steal $230.23.

## INDICTMENT 38490.

On May 11, 1977, the defendant and Vicino went to the home of one Gertrude Hill, who was eighty-five years old, and sold her two insurance policies with a combined annual premium of $385.65. No other insurance was sold to her that day. They received a check from her for $453.83. After they left Hill's home the defendant told Vicino that there had been a $60 "policy," or application fee added to the cost of the policies. He gave Vicino half of that amount in addition to his normal commission. Hill was not told of this extra charge, and it was not listed on the application. This evidence warranted a finding that the defendant represented to Hill that the premiums for the two policies totalled $453.83 and that he had fraudulently induced her to pay about $60 more than the actual premiums for the policies.

## INDICTMENT 38491.

This indictment charged larceny from Roland Catignani on September 9, 1977. Catignani testified that in September, 1977, the defendant told him of "a very interesting situation [a policy of medical insurance] he had lined up with an insurance company, Union Fidelity Company at Trevose, Pennsylvania." As a result Catignani gave the defendant a check dated September 9, 1977, for a quarterly premium in the amount of $130.71. A bank deposit ticket dated September 15, 1977,

which was taken from the defendant's records, bears a notation on the back, "Prem. 130.71 Cataganni [*sic*]." Catignani never received a policy from the defendant and was unable to contact him by letter, by telephone or in person. A representative of the Union Fidelity Life Insurance Company testified that the company never received from the defendant any application or correspondence concerning Catignani. The jury could have found from this evidence that the defendant had obtained Catignani's check by false representations, intending to keep the money. Further support for the conclusion that the defendant's failure to obtain a policy for Catignani was not inadvertent or otherwise innocent could be found in the proof of other fraudulent conduct under similar circumstances. See *Commonwealth v. Edgerly*, 6 Mass. App. Ct. at 252.

## Indictments 38493 and 38494.

These indictments charge larceny on March 23, 1977, from Beatrice Stapler and Elizabeth McProud, respectively. Vicino testified that he went to Eunice Smallman's house and sold her annuities for her two daughters, Stapler and McProud. He completed applications to American for the two annuities, listing a $480 annual premium for each. Each application was signed by the daughter for whom it was written. Vicino gave the defendant a check for $960 that he had received from Smallman, and the defendant deposited the check. The applications were received by American with the $480 figure on each crossed out and $240 substituted. Vicino did not make that change. Checks for $240 for each policy sent by the defendant to American indicated that the payments were for six-month premiums. The company did not later receive any payment of a premium on these policies from the defendant. The defendant argues that this evidence would not support convictions of larceny from Stapler and McProud (rather than Smallman). We disagree. The evidence permitted a finding that they purchased the annuities and that their mother made gifts to

them of the amounts of the premiums when she wrote the check to Yankee on their behalf. The evidence warranted the verdicts under either a false pretense or embezzlement theory of larceny. See G.L. c. 277, § 41; *Commonwealth* v. *King,* 202 Mass. 379, 387-389 (1909); *Commonwealth* v. *Corcoran,* 348 Mass. at 440-441.

In summary, the motions for directed verdicts on indictments 38478, 38480, 38481, 38486, 38488, 38490, 38491, 38493 and 38494 were properly denied; the motions for directed verdicts on indictments 38482 and 38483 should have been allowed.

## The Search Warrant.

The defendant argues that a search of his home was made under an unconstitutional "general warrant" and in violation of G. L. c. 276, §§ 1, 2, and that Yankee's records which were seized from there should have been suppressed. He also argues that the affidavit in support of the warrant was insufficient to establish probable cause for its issuance. The warrant directed the seizure of "All records and papers of the Yankee Insurance Agency." We shall describe the contents of the affidavit below in our discussion of probable cause.

At the outset, we note that the warrant, despite its breadth, was not a "general warrant." The hallmark of such a warrant is the discretion vested in the executing officer, as when he is instructed to seize "obscene materials," *Marcus* v. *Search Warrant of Property at 104 East Tenth Street,* 367 U.S. 717, 722, 732-733 (1961), "obscene, indecent or impure books, pamphlets, etc. . . . ." *Commonwealth* v. *Jacobs,* 346 Mass 300, 303 n.6, 305-310 (1963), or records showing fraud in violation of a cited statute, *United States* v. *Abrams,* 615 F.2d 541, 542-543 (1st Cir. 1980). Thus the danger in such cases is that the individual judgment of a police officer will prevail during the course of an unguided search, *Commonwealth* v. *Jacobs,*

*supra* at 308, or that the warrant will permit "a general, exploratory rummaging in a person's belongings." *Coolidge* v. *New Hampshire,* 403 U.S. 443, 467 (1971). That, however, is not the case here. The warrant was specific: the executing officers knew they were to seize *all* of Yankee's records, a broad but nevertheless sufficiently particular description. See *In re Lafayette Academy, Inc.,* 610 F.2d 1, 5-6 (1st Cir. 1979); *United States* v. *Abrams, supra* at 549 (concurring opinion, Campbell, J.). There was no occasion for the exercise of discretion in determining, as for example in *Marcus, Jacobs* or *Lafayette Academy,* whether certain papers were evidence of fraud or certain publications obscene.[3]

Although the warrant was not "general," we must nevertheless determine whether there was probable cause for its issuance. We are particularly concerned with whether, if probable cause did exist, it was probable cause which would justify seizure of all of Yankee's records — that is, whether the scope of the search was impermissibly broadened beyond the foundation of probable cause. See *VonderAhe* v. *Howland,* 508 F.2d 364, 369-370 (9th Cir. 1975); *United States* v. *Roche,* 614 F.2d 6, 7 (1st Cir. 1980). We bear in mind the requirement of *Warden, Md. Penitentiary* v. *Hayden,* 387 U.S. 294, 307 (1967), that there must be cause to believe that "mere evidence" which is to be seized pursuant to a warrant will aid in a particular apprehension or conviction. See *Andresen* v. *Maryland,* 427 U.S. 463, 482-484 (1976).

---

[3] The Supreme Judicial Court has reserved the question of what degree of specificity in the description of documents might satisfy the Fourth Amendment but has said "that it is better practice, whenever possible, to frame documentary descriptions in particularized terms. See *In re Lafayette Academy, Inc., supra* at 4 n.4." *Commonwealth* v. *Accaputo,* 380 Mass. 435, 447 (1980). It is not clear whether a constitutional requirement that the description of documents in a warrant be narrowed by "category, time periods, and the like," as is suggested in *In re Lafayette Academy, Inc.,* 610 F.2d 1, 4 n.4 (1st Cir. 1979), would be designed to protect against something other than the danger of the exercise of discretion by the executing officer. We prefer to analyze this question by comparing the probable cause established by an affidavit with the range of materials described in the warrant to determine whether the warrant is broader than the probable cause supporting it. We do so below.

The warrant affidavit stated that the affiant, a sergeant in the State police, had received information from two named investigators from the Division of Insurance. An investigation had resulted from the complaint of one named woman (not one of the victims specified in any of the indictments). The affidavit stated that the investigation "resulted in serious allegations of criminal nature in regards to the Yankee Insurance Agency and its business transactions," including "[p]olicies paid for [which] were not received by the insureds and monies placed in the Yankee Insurance Agency account." Those statements formed the essential basis for probable cause to believe that criminal acts had been committed, though the affidavit recited additional facts going to the urgency of seizing Yankee's records (i.e., that the defendant was aware of the investigation, that he had closed the agency and disposed of a number of insurance records, and that the affiant feared that the remaining records would be destroyed).

In examining the affidavit, we view the information contained therein with a "commonsense, nontechnical, ungrudging and positive attitude. *United States* v. *Ventresca,* [380 U.S. 102,] 108-109 [1965]." *Commonwealth* v. *Martin,* 6 Mass. App. Ct. 624, 627 (1978). *Commonwealth* v. *Norris,* 6 Mass. App. Ct. 761, 762-763 (1978). *Commonwealth* v. *Grammo,* 8 Mass. App. Ct. 447, 450 (1979). The information is to be evaluated as a whole, and it is permissible to draw reasonable inferences therefrom. *Commonwealth* v. *Smith,* 370 Mass. 335, 343, cert. denied, 429 U.S. 944 (1976). *Commonwealth* v. *Grammo, supra* at 450. Viewing the affidavit in this manner, we believe that it established probable cause to believe that the defendant was involved in a scheme to defraud customers of his insurance agency. The information received by the Division of Insurance investigators, though not set out specifically in the affidavit, showed that their investigation warranted a belief that the defendant was keeping premium money turned over to him. Although the affidavit could have been more artfully worded, we resolve any doubts we might have

in favor of upholding the warrant. *Commonwealth* v. *Grammo, supra* at 450-451. See *United States* v. *Ventresca, supra* at 106.

We turn then to the breadth of the warrant. A common-sense reading of the affidavits reveals a broad scheme by the defendant. This is not a case in which there was any basis in the affidavit for restricting the warrant to, for example, one specific type of insurance policy, as would have been required in *United States* v. *Roche*, 614 F.2d at 7. Nor is this case like *VonderAhe* v. *Howland*, 508 F.2d at 366-370, in which the Internal Revenue Service knew specifically that it sought records of certain types and distinctive colors which were kept in a certain file cabinet in a certain room of a dentist's office, but obtained a warrant to search his entire office and home. The probable cause established by the affidavit brought into question Yankee's entire operation and indicated the probable existence of a scheme to defraud a broad range of its clients. While more particularization of records sought is desirable "whenever possible," *Commonwealth* v. *Accaputo*, 380 Mass. 435, 447 (1980), we conclude that in this case particularization was not possible. The warrant did not exceed the foundation of probable cause established by the affidavit.

## JUDGE'S INSTRUCTIONS.

After beginning his instruction on larceny by telling the jury that larceny "is the wrongful taking of personal property from the possession of another with intent to deprive them of such property permanently," the judge continued: "It isn't necessary that at the time of the original transaction he intended to steal it, but if at sometime in your opinion you believe that from the time of the original transaction until the date of the indictment, if it is proven to your satisfaction that the defendant did intend to use this money for himself or to steal it, take it from the alleged victim, then the intent may be inferred. It doesn't have to be a known

intent at the time of the original transaction." He then instructed the jury that "*in larceny* there are several elements that our court has decided in order to prove larceny" (emphasis supplied), and he listed correctly the elements of larceny by false pretenses. See *Commonwealth* v. *Leonard*, 352 Mass. at 644-645. The judge offered no further definition or explanation of larceny. The defendant excepted to the instruction that the defendant need not have formed an intent to steal at the time he received property from the victim.

We begin our discussion of these instructions by observing that, although the prosecutor characterized all the charges as false pretenses in his summation to the jury, it is doubtful that the Commonwealth would have been bound to prove larceny only by that means, as the defendant claims. The judge could have instructed the jury that the Commonwealth could prove its case by showing embezzlement or false pretenses. See G. L. c. 277, § 41; *Commonwealth* v. *Corcoran*, 348 Mass. at 440-442.[4]

The question, then, is not whether the judge could have instructed the jury on more than one theory of larceny but whether he instructed them properly on the theory he did select. The judge correctly defined larceny by false pretenses, but he identified it simply as "larceny." In context, his instruction that the defendant need not have had the intent to steal at the time he received money, but that he could have formed that intent any time "from the time of

---

[4] In *Corcoran*, it was held that the judge could instruct the jury on any theory of prosecution for larceny which was supported by proof at trial even though the Commonwealth had specified in its bill of particulars that its theory of prosecution was false pretenses. The bill of particulars only restricted the Commonwealth in the proof it could present at the trial, although evidence which supported a charge of larceny by false pretenses could also be used to obtain an embezzlement conviction once introduced. The reason for this rule is that false pretenses and embezzlement have been combined into the one crime of larceny to prevent a defendant from escaping punishment for one form of larceny because his crime is found to be technically another form of larceny. *Commonwealth* v. *Corcoran*, 348 Mass. 437, 440-441 (1965). See G. L. c. 266, § 30.

the original transaction until the date of the indictment," makes no sense. The instruction is obviously inconsistent with the requirement that a criminal misrepresentation must be knowingly false and made with the intent that the person to whom it was made rely on its truth. It is true that a defendant who obtains money from a client and later forms the intent to keep it may be guilty of embezzlement, but the judge made no attempt to define embezzlement separately or to distinguish it from the form of larceny that he did define. The judge had an obligation to state the applicable law clearly and correctly to the jury, so that they would understand the basis for their verdicts. *Commonwealth* v. *Knapp,* 10 Pick. 477, 496 (1830). *Commonwealth* v. *Corcione,* 364 Mass. 611, 618 (1974). *Commonwealth* v. *Wood,* 380 Mass. 545, 548 (1980). We cannot speculate about what the effect the judge's confusing instructions had on the jury, and we must reverse. See *Commonwealth* v. *Corcione, supra* at 617; *Commonwealth* v. *Wood, supra* at 548-549.

Because we reverse on the judge's larceny instruction, we need not reach the defendant's exception to the judge's definition of reasonable doubt, a definition that is unlikely to be repeated on retrial. We note, however, that the language used by the judge, "In order for you to find [the defendant] not guilty you must have a doubt with a reason," implies a shift of the burden from the Commonwealth to the defendant. As such it may not be as immune from challenge as the language, "doubt based upon a reason," standing alone, now appears to be. Compare *Commonwealth* v. *Bjorkman,* 364 Mass. 297, 307-309 (1973) ("doubt based upon a reason," even if of doubtful propriety, not prejudicial in context of charge in its entirety); *Commonwealth* v. *Coleman,* 366 Mass. 705, 712 (1975) ("doubt based upon a reason" held "satisfactory"); *Commonwealth* v. *Hughes,* 380 Mass. 596, 601 (1980) ("doubt based upon a reason" approved).

OTHER ISSUES.

The defendant raises three other issues which may arise on retrial.[5]  Accordingly, we address them now.

1. *Detective Smith's Report.*

Counsel for the defendant, in cross-examining Detective Smith of the Barnstable police about his memory of a conversation he had had with the defendant, showed him a report he had made about another aspect of the investigation.  Smith acknowledged that no conversation with the defendant was described in the report and that he had not made another report covering a conversation with the defendant.  After this questioning, the Commonwealth offered the report in evidence, and it was admitted subject to the defendant's exception.  The report shown to Smith contained information received from a bank officer about the activity in Alice Booth's checking account, and repeated statements that appear to have been made by Booth to the bank officer.  Included in the report is the statement, "It appears that Mrs. Booth is afraid of these men; she even described the situation as 'them putting a gun to her head' but it is believed that this was just her way of describing it; rather than an actual gun being used."

Such a police report, containing multilevel hearsay, is inadmissible.  *Kelly* v. *O'Neil,* 1 Mass. App. Ct. 313, 314-317 (1973).  *Commonwealth* v. *Happnie,* 3 Mass. App. Ct. 193, 199-200 (1975).  See *Julian* v. *Randazzo,* 380 Mass. 391, 392-394 (1980).  The Commonwealth contends, however, that the report became admissible under the rule of *Leonard* v. *Taylor,* 315 Mass. 580, 581 (1944), which provides that "where a party at a trial calls for a document from his opponent and in response to the call receives it and examines it, the document may be put in evidence by the opponent, even though it would have been incompetent if it had not been called for and examined."

---

[5] We do not reach the defendant's objection to the prosecutor's remarks in his summation because that issue is not likely to recur.

We need not decide whether the *Leonard* rule should apply to a report such as this requested at a criminal trial,[6] because no demand was made at the trial which would trigger the *Leonard* rule. As far as can be determined from the transcript of the trial, the report was first obtained by counsel for the defendant during his examination of Smith at the hearing on the motion to suppress, and was at that time marked only for identification. This was, of course, outside of the hearing of the jury and was not an example of the "bold and dramatic demand" which the *Leonard* rule was designed to protect against. *Leonard* v. *Taylor, supra* at 582. See *Commonwealth* v. *Marsh,* 354 Mass. 713, 721 (1968).[7] By the time the defendant referred to the report when questioning Smith at the trial, it was already in the court's possession.

A police officer's notes of a conversation with a defendant were admitted in evidence in similar circumstances, after the officer had been cross-examined, in *Commonwealth* v. *Beaulieu,* 333 Mass. 640, 648-650, cert. denied sub nom. *Weaver* v. *Massachusetts,* 351 U.S. 957, and sub nom. *Boisvert* v. *Massachusetts,* 352 U.S. 857 (1956). In *Beaulieu* the admission of the police officer's notes was held to be error even though the defendant in that case, unlike the defendant here, had cross-examined the policeman about the substance of his notes. It was error to allow Smith's report to be admitted in evidence.

2. *Motion for Statements of Defendant.*

The defendant made a motion for copies of any written documents and the substance of any oral statements made by him. They were provided to him by the Commonwealth. However, he claimed at the hearing on his motion that he had received only "a sanitized summation of the beliefs of the Assistant Attorney General." The prosecutor

---

[6] See *Commonwealth* v. *Ellison,* 376 Mass. 1, 22-23 & n.11 (1978).

[7] If the report had been obtained from the Commonwealth at the pretrial discovery stage, it would not have been rendered admissible under *Leonard. Commonwealth* v. *Ellison,* 376 Mass. 1, 22-23 (1978).

represented to the judge that the statements he had provided were verbatim reports of all the defendant's statements and that they had been taken from reports which contained information concerning *ongoing investigations of other insurance agencies.* The defendant requested that the judge conduct an in camera review of "all those statements." The judge, accepting the prosecutor's representation that he had turned all statements over to the defendant, refused. The defendant claims that this was error under *Commonwealth v. Lewinski,* 367 Mass. 889, 900-903 (1975).

We hold that the judge had no obligation to conduct an in camera review of the prosecutor's reports in the circumstances of this case. No suggestion was made that the statements of the defendant, which were the subject of the motion and which the prosecutor stated were supplied verbatim, were edited in any way. The judge was justified in accepting the prosecutor's representation that he had supplied the defendant with all statements. We note as well that we have sent for the statements submitted by the prosecutor, which were filed with the court, and it is clear that the substance of all significant statements of the defendant introduced through testimony at trial was contained in the statements submitted.

3. *Severance.*

The defendant claims error in the denial of his motion to sever the eleven indictments from each other. Whether indictments joined for trial should be severed is a matter within the sound discretion of the judge. *Commonwealth v. Drew,* 4 Mass. App. Ct. 30, 33 (1976). *Commonwealth v. Doyle,* 5 Mass. App. Ct. 544, 547 (1977). To determine whether the judge has abused his discretion, we look to see whether joinder has resulted in prejudice to the defendant or whether his substantive rights have been adversely affected. *Commonwealth v. Doyle, supra* at 547. Ordinarily when, as here, the offenses joined are "kindred and liable to punishment of the same general character," there is no abuse of discretion in refusing to sever indictments. *Com-*

*monwealth* v. *Drew, supra* at 33. *Commonwealth* v. *Doyle, supra* at 547. We note that if the indictments had been severed, evidence relevant to each could have been introduced at the trial of the others to prove the defendant's intent to commit larceny by false pretenses. See *Commonwealth* v. *Benjamin,* 3 Mass. App. Ct. 604, 623-627 (1975); *Commonwealth* v. *Edgerly,* 6 Mass. App. Ct. at 252. We cannot say that the defendant's substantive rights were adversely affected if the jury "cumulated" the evidence. There was no abuse of discretion.

The judgments are reversed and the verdicts set aside. Judgments of acquittal are to be entered on indictments 38482 and 38483.

*So ordered.*