## COMMONWEALTH vs. HOWARD R. RESKE, JR.

No. 96-P-873.

Norfolk. April 11, 1997. - September 18, 1997.

Present: PERRETTA, GILLERMAN, & KASS, JJ.

*Larceny. False Pretenses.*

At the jury-waived trial of complaints for larceny (by false pretenses) of property over $250, arising out of the sale of six motor vehicles to a person of obviously impaired cognitive capacity, the evidence was sufficient for the judge to conclude that the defendant sales manager presented the victim with inflated invoices, knowing them to be inflated, intending the victim to rely on the statements therein, and induced the victim thereby to part with $23,651 in overcharges; the judge correctly denied the defendant's motion for a required finding of not guilty. [524-527] GILLERMAN, J., dissenting.

INDICTMENTS found and returned in the Superior Court Department on September 9, 1993.

The cases were heard by *Vieri Volterra*, J.

*George Hassett* for the defendant.

*Dennis C. Mahoney*, Assistant District Attorney, for the Commonwealth.

KASS, J. Evidence adduced by the Commonwealth supported findings made by the Superior Court judge, to whom the case was tried without a jury, that over a period of five weeks the defendant Howard R. Reske, Jr., sold to a customer who was mentally impaired six new pickup trucks on terms that resulted in between four to six times the normal profit margins. Reske was convicted of six counts of larceny of property over $250, G. L. c. 266, § 30, more particularly, larceny by false pretenses. At trial, Reske made timely motions for a required finding of not guilty, and presses that point on appeal. His contention is that the evidence, taken in a light most favorable to the Commonwealth, describes acts that are morally reprehensible but that they are not a crime. We affirm the convictions.

First, we spell out the facts found by the judge and which, we are satisfied, were solidly based in the record.

Ronald Nellon,[1] who was borderline retarded[2] and whose subnormal intellectual capacity was readily apparent, had come into an inheritance of $142,409. With money in his pocket, Nellon was able to indulge one of his dearest wants: to buy trucks. During the period of the sales, June 8, 1992, to July 17, 1992, Reske was the general manager of Quirk Chevrolet in Braintree (Quirk). He established the terms of sale in the six purchases that Nellon made.

In the first transaction, that which occurred on June 8, 1992, salesmen for the dealership had fixed a price of $17,566, yielding a profit of $1,145. That was very close to what David Quirk, the dealership's principal, had testified was the average or normal profit on a truck sale. A salesman for Quirk and Nellon got so far as to sign an agreement at that price. Reske reviewed the contract (one might think that a general manager would review a sales contract *before* it was signed) and raised the price $2,000 by increasing the "price of unit" $1,000 and decreasing the trade-in allowance $1,000. Now the profit was $3,145.[3] Nellon contentedly signed the new agreement, although it was markedly to his disadvantage.

The second transaction occurred on July 1, 1992, and produced a profit of $4,943, four times the norm, by adding $2,610 to the sticker price (the manufacturer's suggested retail price) and "low balling" the allowance on the truck — purchased at another dealership on June 13, 1992, and with 175 miles on the odometer — that Nellon was trading in.

The third transaction, on July 8, 1992, was $2,700 over the sticker price and gave Nellon a trade-in allowance of $7,775 on the truck he bought from Quirk a week earlier and that had 109 miles on the odometer. The profit from this transaction was $7,288, six times the norm.

The fourth transaction occurred the very next day, i.e., July 9, 1992. Nellon received a trade-in allowance of $5,876 on the truck he had bought the day before for $14,625. The odometer on that vehicle read 26 miles. The profit margin on this transaction came to $4,313.

---

[1] A pseudonym.

[2] He had an IQ of 79 and could not comprehend numbers over 100.

[3] The computation of profits on each of the six transactions was made by the comptroller of the Quirk companies.

The fifth transaction again occurred on the day following the previous one. Nellon received a trade-in allowance of $5,530 on the truck for which the day before he had paid $13,818. The odometer reading was 20 miles. Profit on this sale came to $5,085.

The sixth transaction occurred on July 17, 1992. Reske allowed a trade-in of $4,925 on a truck that Nellon had purchased from another dealer for $13,470. At the time of trade, that vehicle had 125 miles on its odometer. The value of the truck traded in was placed on Quirk's books at $9,500. The profit on this transaction was $6,077.

A prosecution on the theory of larceny by false pretenses — that aspect of the larceny statute under which the prosecution proceeded — requires proof that: (1) a false statement of fact was made; (2) the defendant knew or believed the statement to be false when he made it; (3) the defendant intended that the person to whom he made the false statement would rely on it; and (4) the person to whom the false statement was made did rely on it and, consequently, parted with property. *Commonwealth* v. *Leonard*, 352 Mass. 636, 644-645 (1967). *Commonwealth* v. *Kenneally*, 10 Mass. App. Ct. 162, 164 (1980).[4]

The core of Reske's defense is that he made no false statements of fact, that prices are a matter of opinion, and — the defense comes to this — it is not a crime to gull a willing dupe. It is commonplace that prices, unless regulated, are subject to market fluctuation. That does not mean, however, that there is no such thing as a false statement about the value of an item that is for sale. *Reinherz* v. *American Piano Co.*, 254 Mass. 411, 420-421 (1926). *Commonwealth* v. *Coshnear*, 289 Mass. 516, 522 (1935).

Here, the finder of fact may infer a false statement as to the value of the six trucks sold by Quirk to Nellon[5] from the inordinate profit margin, from the manifestly unrealistic trade-in allowances, and from the inflation over sticker prices. There was evidence of market norms, that those norms had been exceeded by manipulation of trade-ins and base prices, that

---

[4]The once separate crimes of larceny, embezzlement, and larceny by false pretenses have been merged into the one crime of larceny since 1899. *Commonwealth* v. *King*, 202 Mass. 379, 388 (1909).

[5]When David Quirk, the principal of Quirk Chevrolet, noticed the pattern of sales to Nellon, he ordered that no more sales be made to Nellon and Quirk made full restitution to Nellon for the amounts he had been overcharged.

those norms were so exceeded that the dealership thought it proper to make restitution. A salesman under Reske's supervision quit his job because he thought what was being done to Nellon was so immoral. An experienced dealer, Reske knew that the prices he was charging Nellon had no relation to what he customarily charged. This could be inferred from his doctoring of the prices in the first contract, prepared in accordance with customary prices and profit margins by salesmen who reported to him. False statements of value could also be inferred from evidence given by an experienced car dealer that sales above sticker price were not normal, nor was it normal to take $7,000 off the price of a vehicle that had been driven only for 24 hours and 33 miles.

There is a distinction between stating the price of a mine, a share of corporate stock, a piece of jewelry, or a work of art, as to which values are freighted with opinion, and goods sold as widely to the general public as new automobiles. It is simply not correct to suppose that automobile prices are so relative that it is not possible to state a false price. There are acceptable yardsticks. Dealer invoice prices are obtainable information and they set the base. Sticker prices, except for one brand of car which has a sales policy of selling at sticker price, are the ceiling. A price over sticker price would not be justifiable. See *How to Buy or Lease a Car*, Consumer Reports, Apr. 1997, at 13-15. Fair trade-in prices can be established through an industrial reference source known as the Blue Book. See *Buying a Used Car, id.* at 17.

Nevertheless, the dissenting opinion insists that in the absence of some express statement by Reske that the prices charged or the values given in trade were fair market prices and values, there is no false statement of a fact. We think that far too literal — certainly in the peculiar circumstances of this case. The confidence man is generally subtle when winning the confidence of the mark and a false pretense may consist of an act, symbol, or token calculated to deceive, such as grossly off-market prices or credits stated on forms of an established automobile agency selling a respected line of automobiles. *Commonwealth* v. *Morrison*, 252 Mass. 116, 122 (1925). "It is not necessary to have direct evidence that a representation was false. It is enough if all the circumstances considered together would warrant the jury in concluding that it was untrue." *Id.* at 122-123. A false pretense may be made by implication as well as by verbal

declaration. *Commonwealth* v. *Louis Constr. Co.*, 343 Mass. 600, 604 (1962) (misstated bills in that case found not to be made with fraudulent intent).[6] *Bright* v. *Sheriff*, 90 Nev. 168, 170 (1974). The padding of the invoices in the instant case was not fundamentally different from padding of the vouchers in, e.g., *Commonwealth* v. *Ianello*, 344 Mass. 723, 734-736 (1962).

Reske wanted those false values to be accepted by Nellon. He expected them to be accepted because Nellon's impaired cognitive capacities rendered him a gullible mark. The days may be over when caveat emptor was a byword of capitalism and a sucker had only himself to blame. Cf. *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 712-714 (1990). Even at the apogee of economic Darwinism, however, there was an underlying assumption that the mark had normal mental capacity. Given Nellon's obviously addled state, taking his money was on the same larcenous plane as the extraction of money from a credulous and incompetent customer for an insurance policy never applied for in *Commonwealth* v. *Kenneally*, 10 Mass. App. Ct. at 165-166.

The dissent advances the somewhat curious proposition that, unless a statute defines as a crime the selling or buying of property to or from a manifestly incompetent person at greatly inflated profit margins, which any person of normal understanding would reject as unacceptable, then there is no crime. The law is not so inelastic. Larceny by false pretenses is a crime of ancient lineage, originally enacted in 1757 by Parliament to supplement the common law.[7] St. 30 Geo. 2, c. 24, § 1 (Eng.). Our own statute, now G. L. c. 266, § 30, descends from that source. *Commonwealth* v. *Drew*, 19 Pick. 179, 182 (1837). See generally LeFave & Scott, Handbook on Criminal Law § 90 (1972). It is a statute broad in scope and its application is not "limited to cases against which ordinary skill and diligence cannot guard; . . . one of its principal objects is to protect the weak and credulous from the wiles and stratagems of the artful and cunning." *Commonwealth* v. *Drew*, *supra*, at 184. The opinion continues, "but there must be some limit, and it would seem to be unreasonable to extend it to those who, having the

---

[6]Compare *Commonwealth* v. *Ianello*, 344 Mass. 723, 734-736 (1962), in which a more systematic overcharge for sidewalk replacement was considered to be a basis for larceny by false pretenses.

[7]One who obtained title to property, the English courts had held, was not guilty of larceny; hence the remedial statute.

means in their own hands [in that case a bank] to protect themselves. It may be difficult to draw a precise line of discrimination applicable to every possible contingency, and we think it safer to leave it to be fixed in each case as it may occur." *Id.* at 185.

Precisely so. Here the mark's disability was the key necessary to Reske's being able to relieve him of his money through a false pretense of ordinary dealing in the automobile market. Nellon was quintessentially weak and credulous. Reske crossed the prohibitory line, and did so following a repetitive pattern. Cf. *Commonwealth* v. *England*, 350 Mass. 83, 87 (1966); *Commonwealth* v. *Pina*, 1 Mass. App. Ct. 411, 415 (1973).

As to the fourth element of the crime, the unfortunate Nellon did rely on Reske's inflated and deflated figures and paid whatever he was asked for, thus, parting with at least $23,651, which, in the aggregate, could not honestly have been charged. As to each of the six transactions, the amount of overcharge was substantially above $250.

Proof of the elements of larceny by false pretenses were, thus, put before the trial judge and he rightly denied the motion for a required finding of not guilty.

*Judgments affirmed.*

GILLERMAN, J. (dissenting). I have no doubt that there was larceny in the defendant's heart as he rewrote the first sales contract and wrote up the remaining five contracts for Nellon to sign. But it is fundamental to criminal law that "there can be no criminal liability for bad thoughts alone. . . ." LaFave and Scott, Substantive Criminal Law § 1.2(b) at 10 (1986). I dissent because I conclude that the defendant's conduct, however exploitive and unfair it may have been, does not fall within the crime of larceny by false pretenses.

1. *There was no evidence of a false statement of material fact.* The gist of the crime of larceny by false pretenses, as the majority points out, is proof that a false statement of fact was made by the defendant upon which the victim relied. The Commonwealth failed to introduce any direct evidence that the defendant made any false statements to Nellon. Neither Nellon nor the defendant testified, nor was there a witness who testified to what he heard the two men say to each other, and there was

no other evidence of what the defendant said to Nellon, or of what Nellon said to the defendant.

Nevertheless, the judge found that there were misrepresentations of fact made by the defendant to Nellon. He found that the statements on the purchase contracts (which he referred to as "invoices . . . prepared by the defendant") "*contain* false statements of fact because they consistently undervalued the value of the trade-in and consistently overvalued the Maroney sticker prices [i.e., the manufacturer's suggested retail price, commonly known as the 'sticker price']" (emphasis added).

The purchase contracts prepared by the defendant and signed by Nellon are barren of any words of representation. The contracts merely recorded the price of the vehicle sold, the trade-in allowance, the miscellaneous costs of the transaction, and the mathematical calculation of the cash due on delivery of the vehicle purchased.

The judge's argument proves too much. He ruled, in substance, that the terms of the transactions were *so* unfair that the terms themselves were "false statements." But it makes much more sense to say that if the terms were *that* unfair, no competent adult would accept those terms regardless of what was said. I return to this point below; it is enough to say where, as here, a contract merely recites the financial terms of a transaction, it is unreasonable to conclude that those financial terms may be taken as a representation as to the fair value of the vehicles sold and bought. A car salesperson who offers and sells a vehicle to a competent adult in excess of the sticker price, or who offers and buys a used vehicle for less than blue book has not, without more, committed larceny; this is so because the offeror has made no false statement of fact.[1]

The judge, not unmindful of the problem presented by this unusual case, acknowledged that (on his view of the purchase

---

[1]The commentary to the Model Penal Code offers the following discussion to illustrate the irrelevancy in the criminal law of the unfairness of a bargain brought about by an undisclosed material fact. "Taking advantage of a known mistake that is influencing the other party to a bargain is not criminal under existing law in the absence of special circumstances imposing a duty to correct the mistake. The miner who discovers that his mine is nearly exhausted of ore may sell it to a stranger although he is fully aware that the stranger is buying under the mistaken belief that the property is still valuable as a mine." See comment 3(f) to § 223.3 (1980).

contracts) the statements of value "were opinions," but he ruled that "values may be stated falsely," citing *Commonwealth* v. *Coshnear*, 289 Mass. 516, 522 (1935).

*Coshnear* provides no support for the judge's conclusions. That case involved a circular for the sale of stock which stated that "the stock [being offered for sale] *was selling* at a fair market price *in the open market* in the vicinity of" $125 per share (emphasis added). In fact, the evidence was that the defendants were purchasing the shares of the same stock at $100 per share, and "in many instances [for] much less. . . ." *Id.* at 523. In *Coshnear*, the defendant's statement had to do with actual sales in the open market; the statement was both explicit and demonstrably false. In the case before us, there was no evidence that the defendant made *any* statement.

The majority, rightly perceiving that the purchase contracts cannot themselves "contain" false statements of fact, as the judge found, argues that the "finder of fact may infer a false statement as to the value of the six trucks. . . ."[2]

The majority's argument does no better, it seems to me, than that of the judge. The manifestly unreasonable terms of the six transactions were not accepted by Nellon because of some unknown, untestified-to false statement of fact by the defendant upon which Nellon relied; no reasonable, competent adult would accept such extravagant terms no matter what he was told. Rather, Nellon accepted the six transactions because his impaired cognitive ability disabled him from realizing that the terms of the transactions were grossly unfair to him. The majority's "inference" of false statements is pure conjecture. See *Brown* v. *Commonwealth*, 407 Mass. 84, 89 (1990), *S.C.*, 414 Mass. 123 (1993).

Moreover, I believe Massachusetts decisional law does not support the proposition that in a business transaction involving the purchase and sale of property, a statement — much less an inferred statement — regarding value is a statement of fact rather than one of opinion. "It has long been settled that false

[2]I note that the Commonwealth did not try this case on the theory now put forward by the majority, and the judge did not decide the case on that theory. See note 4, *infra*. See, however, *Commonwealth* v. *One 1986 Volkswagen GTI Auto.*, 417 Mass. 369, 370 n.1 (1994) ("The theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review . . .").

statements concerning the market value of property are held to be matters of opinion, judgment, or seller's talk, and do not afford any ground for a claim for damages . . . in an action for false representations . . . ." *Gaucher* v. *Solomon*, 279 Mass. 296, 299 1932). See *Davis* v. *Noone*, 341 Mass. 488, 492 (1960) ("use of the words 'fair market value". . . would have been a matter of opinion"); *Ross* v. *Friedman*, 22 Mass. App. Ct. 513, 517 at n.8 (1986) (plaintiff sought to rescind a compromise agreement in a will contest, claiming a mutual mistake of fact regarding the value of·estate property. The court rejected the argument. Quoting from 3 Corbin, Contracts § 605 (1960), we wrote, "Value is one of the principal subjects of agreement. Each party is consciously assuming the risk of error of judgment. As to this, *by business custom, by prevailing mores, by social policy, and by existing law, the rule is caveat emptor. It is also, and in equal degree, caveat vendor"* (emphasis supplied); *Schwanbeck* v. *Federal-Mogul Corp.* 31 Mass. App. Ct. 390, 410 (1991), *S.C.*, 412 Mass. 703 (1992) ("Estimates of value by a prospective seller to a prospective customer, especially a sophisticated one, cannot be seriously considered as a representation. What the seller depicts as a golden goose the buyer describes as an albatross; the seller's lake is the buyer's pond"); *McEneaney* v. *Chestnut Hill Realty Corp.*, 38 Mass. App. Ct. 573, 575 (1995) (quoting from Restatement (Second) of Torts § 538A: "A representation is one of opinion if it expresses only. . . his judgment as to . . . value"). The core judgment embedded in the rule of caveat emptor is that offers and counter offers, without more, are not representations of value, much less a representation of the speaker's honest belief in the fairness of the offer.

*Commonwealth* v. *Leonard*, 352 Mass. 636, 644-645 (1967), and *Commonwealth* v. *Kenneally*, 10 Mass. App. Ct. 162, 165-166 (1980), which the majority cite, are inapposite. *Leonard* involved false invoices regarding the number of men on the job, the amount of overtime, and the amount of supervision of the job. There was no issue of value as a statement of fact. In *Kenneally*, the issue was proof of the defendant's intent to steal, not whether the expression of an opinion as to value was a statement of fact.[3]

---

[3]It is also worth noting that, to establish "value," the majority relies on "market norms" — referring, presumably, to the "sticker price" (i.e., the manufacturer's suggested retail price) and the "blue book" of the National Automobile Dealers Association. The sticker price is self-defined as a mere

In the end, I believe, the judge, explicitly,[4] and the majority, in more expressive but succinct terms,[5] recognized that the impaired cognitive capacity of Nellon was indispensable to the result they reached. Nellon's lack of capacity to understand and consent to transactions that no reasonable, competent adult would have accepted provides the underlying rationale for the judge's decision and the majority's opinion.[6] Therein lies the difficulty, in my view.

2. *The exploitation of an elderly or disabled person is not, without more, a crime in Massachusetts.* The cases dealing with larceny by false pretenses have focused on the false representations of the defendant, not the victim's perception of those events. See, e.g., *Commonwealth* v. *Beckett*, 373 Mass. 329

suggestion, and the blue book, according to testimony by the Commonwealth's witness, was merely a "guideline" which will vary with the individual transaction and "market conditions."

[4]During the trial the defendant moved to strike the Commonwealth's evidence of the incompetency of Nellon. The judge denied the motion. He said it is not the Commonwealth's theory to prove "that this defendant defrauded the victim. That is not the theory at all. . . . We agree everybody can buy cheap and sell dear. *But you can't take advantage of someone who can't add it all up*, and falls prey to this sort of cunning, as they put it. . . . I mean that is all I know, *So I am going to try it on their theory.*" (Emphasis added.)

In his judgment which he announced from the bench immediately following the conclusion of the trial, the judge emphasized that the defendant knew or should have known what the fair market value of the vehicles were, and that such values may be, and were stated falsely. Then the judge — who earlier in his opinion had found that Nellon was "borderline retarded" — pointed out that "*the defendant. . . knew that [Nellon] was not really competent to enter into any contractual relationships.* Competence to engage in business transactions is more than a transient surge of lucidity. It involves not merely comprehension of what is going on, but an ability to comprehend the nature and quality of the transaction, together with understanding of its significance and consequences." (Emphasis added.)

The judge concluded that the conduct of the defendant was "inexcusable and criminal," and found him guilty on all six indictments.

[5]Viz.: "The days may be over when caveat emptor was a byword of capitalism and a sucker had only himself to blame."

[6]But for Nellon's diminished cognitive ability, he would have been bound by the transactions, whether or not he had read or understood the agreement, see *Spritz* v. *Lishner*, 355 Mass. 162, 164 (1969), whether or not he could read, *ibid.*, and regardless of the adequacy of the consideration, see *Graphic Arts Finishers, Inc.* v. *Boston Redev. Authy.*, 357 Mass. 40, 43 (1970) ("The law does not concern itself with the adequacy of consideration; it is enough if it is valuable"), and criminal charges would not have been brought.

(1977) (defendant's misrepresentation to the Department of Public Welfare); *Commonwealth* v. *Catania*, 377 Mass. 186 (1979) (defendant negotiated a forged cashier's check); *Commonwealth* v. *Crocker*, 384 Mass. 353 (1981) (defendant cashed forged checks). In recent years, a number of States, recognizing the special vulnerability of elderly and disabled persons, have enacted statutes involving criminal penalties which are designed to discourage the exploitation of such persons.[7]

The Florida statute is the most precise and illuminates the problem at hand. It is a crime in Florida for a person to obtain or use the funds of an elderly or disabled person if the accused "knows or reasonably should know that the elderly person or disabled adult lacks the capacity to consent." Fla Stat. c. 825.102 (1996 Supp.).

The Massachusetts Legislature did address the problem of the exploitation of elderly and disabled persons in 1995 when a statute was enacted, entitled "An Act relative to the assault, abuse, neglect and financial exploitation of an elderly or disabled person." St. 1995, c. 297. Section 9 of c. 297, amends G. L. c. 266, § 30, the larceny statute, by adding subsection (5) which deals with larceny from a person sixty years or older, or a disabled person. However, new subsection (5) merely provides for increased penalties where the victim is a person sixty years or older, or a person with a disability. Subsection five does *not* change the elements of the substantive crime; it remains the same in subsection (5) as it currently appears in subsection (4): "Whoever steals, or with intent to defraud obtains by a false pretense. . . ." Moreover, St. 1995, c. 297, was passed approximately two years *after* a grand jury indicted the defendant charging him with the crimes for which he was convicted in this case.

The point need not be labored. Until the Legislature decides to enact appropriate remedial legislation, such as that enacted in Florida, protecting a person in Nellon's circumstances from exploitation by unethical persons, Nellon's lack of capacity to understand and consent to the unfair transactions imposed upon

[7]In Delaware, see Del Code Ann. tit. 31, § 3913 (1996); in Florida, see Fla. Stat. c. 825.102 (1996 Supp.); in Illinois, see 720 Ill. Comp. Stats. 5/16-1.3 (West 1996); in North Carolina, see N.C. Gen. Stat. § 14-32.3 (1996 Supp); in South Dakota, see S.D. Codified Laws § 22-46-3 (Michie 1997 Supp.); in Utah, see Utah Code Ann. § 76-5-111 (1996 Supp.); and in Wyoming, see Wyo. Stat. Ann. § 35-20-109 (Michie 1997).

him by the defendant has no bearing on the crime with which the defendant is charged, and the position of the majority, in my view, cannot be maintained.[8] See *Commonwealth* v. *Drew*, 19 Pick. 179, 184-185 (1837), cited with approval in *Commonwealth* v. *Louis Constr. Co.*, 343 Mass. 600, 604-605 (1962). In *Drew*, the defendant opened and thereafter maintained a checking account as part of his plan to obtain money from the bank at a time when there were insufficient funds in his account. The defendant, without making any statement to the bank, "merely drew and presented his checks and they were paid." *Id.* at 184. As planned, there were not sufficient funds in the account to cover the check. The verdict was set aside. The defendant could not be charged with having obtained money from the bank by false pretenses because he made no "representation of some fact or circumstance, calculated to mislead, which . . . [was] not true." *Ibid.* In citing *Drew* with approval, the court in *Louis*, quoted the following passage in *Drew*: "It is not the policy of the law to punish criminally mere private wrongs. . . [I]t would be inexpedient and unwise to regard every private fraud as a legal crime." 343 Mass. at 605. See also *Commonwealth* v. *True*, 16 Mass. App. Ct. 709, 713 (1983).

The judgments should be reversed and the findings set aside.

---

[8]It is not entirely irrelevant to point out that automobile salespersons are not subject to licensure by the Commonwealth, and particularized criminal penalties in connection with the sale of motor vehicles are limited to a few events. See G. L. c. 266, § 139 (altering identifying numbers); c. 266, § 92A (requiring disclosure of certain conditions affecting motor vehicles); c. 266, §§ 141 and 141A (regarding odometers and speedometers); c. 111, § 142K (emission standards).