NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1123                                            Appeals Court


COMMONWEALTH  vs.  NICHOLAS OCCHIUTO.


No. 13-P-1123.

Essex.     April 13, 2015. - October 13, 2015.

Present:  Cohen, Wolohojian, & Maldonado, JJ.


Larceny.  False Pretenses.  Evidence, Hearsay, Intent.  Intent.
    Intimidation of Witness.  Witness, Intimidation, Police
    informer.  Unlawful Interference.  Practice, Criminal,
    Confrontation of witnesses, Hearsay, Harmless error,
    Witness.



Indictments found and returned in the Superior Court
Department on June 9, 2010.

The cases were tried before Howard J. Whitehead, J., and a
motion for postconviction relief was heard by him.


John M. Thompson for the defendant.
Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.


WOLOHOJIAN, J.  Although hypothetical questions are the

stock in trade of law schools, it is rare to find a criminal

prosecution stemming from the world of make-believe.  But such

we confront here.  The questions raised are:  (1) whether there

was sufficient evidence that the defendant made a false statement of fact to an undercover cooperating witness so as to support his conviction of larceny by false pretenses; and (2) whether the defendant was properly convicted of misleading a police officer with the intent to impede or interfere with a criminal investigation where the investigation was a sham and the underlying crime was a ruse.[1]  We reverse.

Background.[2]  At some point in 2009, the defendant became the target of a drug investigation (code-named "Operation Cryptonite") jointly conducted by Federal, State, and local law enforcement agents.  A cooperating witness, code-named "Olive," was enlisted to attempt to buy two ounces of "crack" cocaine and thirty grams of heroin from the defendant, using money supplied by the agents.  A total of $4,000 was involved:  $2,200 marked and wrapped with a rubber band for the crack cocaine, and $1,800 also marked and wrapped with a rubber band, for the heroin.

---

[1] The defendant raises additional issues with respect to the larceny conviction which we need not reach.  These relate to the admission of certain hearsay, and a claim of ineffective assistance of counsel.  Given our disposition, we also do not need to reach his arguments concerning the single justice's denial of his motion to stay further execution of his sentence.

[2] The facts were not subject to much dispute at trial, nor are they on appeal.  This is probably a function of the fact that much of the critical evidence was introduced through video or audio recordings and therefore did not depend on witness credibility or recollection.  We have listened to and watched all of the recordings, in addition to reading the transcription of their contents as they were played during trial.

On October 21, 2009, in the presence of Federal Bureau of Investigation (FBI) Special Agent Jeffrey Wood, Olive placed a telephone call to the defendant, recorded and transcribed in its entirety as follows:

The defendant:  "Hello?"

Olive:  "What's good?"

The defendant:  "Hey what up?"

Olive:  "Yo, I'm out here, I'll be -- meet me at the same spot in like fifteen minutes."

The defendant:  "Um, instead come scoop me on Franklin."

Olive:  "Franklin?"

The defendant:  "Yeah, Franklin Street.  You know Franklin Street, right?  Call me when you're on Franklin Street.  I will come out -- I will come outside."

Olive:  "All right."

The defendant:  "All right."

Olive:  "All right.  Bye."

This apparently was not the first conversation Olive had had with the defendant that day.  However, the content of that earlier conversation was -- as the Commonwealth concedes -- inadmissible hearsay because Olive did not testify and the Commonwealth sought to introduce it through Special Agent Wood.  We therefore do not include the substance here, although we discuss it later.

Olive used an FBI-provided automobile, outfitted with a hidden camera and recording equipment, to drive to Franklin Street.  Special Agent Wood and Detective Stephen Withrow of the Lynn police department followed in an unmarked car.  Another FBI Special Agent, Darwin Suelen, followed separately.  State police Trooper Jesse Sweet and Lynn police Detective Oren Wright drove directly to Franklin Street in order to observe from that vantage point.

When Olive arrived at Franklin Street, she saw to her surprise that the defendant was with a man she referred to as "Nuck."[3]  This discovery prompted Olive to muse aloud:

> "I don't know if I am going to be able to get this today.  I don't know if I will be able to get it with Nuck.  I don't think I am going to be able --
>
> " . . .
>
> "Yo, I am not going to be able to get this today with Nuck with him.  I am going to try.
>
> "Fuck man."

The defendant got into the rear of the car;[4] Nuck got into the passenger seat next to Olive.  The following exchange ensued:

Nuck:  "What up, what up."

---

[3] Joshua Demos.  We shall refer to him as "Nuck" throughout this opinion to avoid confusion.

[4] The placement of the hidden camera was such that the defendant never appears in the video, but his voice is audible.

Olive:  "What up, what up.  What's good Nuck."

Nuck:  "What's good."

Olive:  "How you doing?"

Nuck:  "How you been?"

Olive:  "I'm doing good.  I'm good.  Where to, same spot?"

Nuck:  "No, take a left down -- actually probably take a left.  Let's go to the end and take a left at the lights."

Olive:  "All right.  All right.  [Handing the two packets of money behind her to the back seat where the defendant was located].  Count this."

While Olive continued to drive following Nuck's directions, she and Nuck conversed about various personal matters.[5] Eventually, Nuck instructed Olive to pull over and stop the car on Arlington Street.  Nuck and Olive continued to converse for several more minutes.  Then, the defendant (who until then had spoken only once or twice on immaterial matters) said:

"[Apparently referring to the two packets of money Olive had handed to him at the beginning of the ride,] So this -- this right here, this is 22, and this right here is 18."

Olive:  "Yes."

---

[5] Frequently interspersed throughout their conversation were Olive's requests that Nuck provide his telephone number and/or that he keep in touch with her.  From the context, it is a fair inference that Nuck and Olive had had an intimate relationship in the past resulting in a child, and that Nuck did not keep in touch with Olive despite her requests.

The defendant:  "All right.  Good."

Olive:  "I separated it for you."

The defendant:  "All right.  Cool good.  Count it out."

The defendant can be heard to say next, "See you right back" while opening the back door of the car.[6]  Nuck, while getting out of the car, said "I am probably about to stay here."  The two men then left the car and walked away.  Olive, left alone in the car, said aloud, presumably for the benefit of the agents:

"All right.  He [referring to Nuck] said he was going to stay here, but I am assuming he ain[']t staying in Lynn.  So let's see.  He is rolling into the house. We're at number 36.  I am at number 36 on Arlington. They're going one, two, three.  The third house in the back next to the picket fence.  I believe it's the third house in the back.  So now I got Dice [the defendant] alone so I will be able to do this."

Over two minutes passed.  Nuck then returned to the car, and opened the front passenger door (where he had been sitting) looking for something:

Olive:  "What you looking for?"

Nuck:  "Did this nigga leave a purple phone in here?"

----

[6] This statement was not transcribed by the reporter and is not part of the trial transcript.  An explanation for its absence may lie in the fact that the videotape was played in segments, not as a whole.  Regardless, the statement was contained on the videotape disk which was admitted in evidence, and a computer was available for the jury to listen to it during deliberations.  The statement was accordingly part of the evidence at trial.

Olive:  "Purple phone?  Looking for a purple phone?"

Nuck:  "It's this chick's phone."  [He opens the back door to look in the back seat.]

Olive:  "No, I don't see no phone.  Do you want me to call it?"

Nuck:  [Having found the telephone in the back seat area,] "You got this number, right?"

Olive:  "No."

Nuck:  "This is the number you were just calling, right?"

Olive:  "Oh, yeah. Yeah."

Nuck:  "Yeah, because this is some chick's number. She lets me use this shit.  Put this down as my shit and just call me on it."

Olive:  "Okay."

Nuck:  "All right.  He's [apparently referring to the defendant] up there talking to his fucking dumb fuck."

Olive:  "All right, fam."

Nuck:  "All right."

Left alone again in the car, Olive remarked to herself, "All right.  Got Nuck's number now."  She then waited for Nuck and the defendant to return.

Instead of returning to Olive's car, the defendant and Nuck emerged on a parallel street where Detective Wright observed them give each other a "high five."  They got into a black Jetta automobile and drove away with the defendant behind the wheel.

The agents concluded that they had observed a possible "rip"[7] (i.e., theft) and a broadcast was made to that effect, to which State police Trooper Mario Millett, yet another member of the joint operation, quickly responded.[8] Trooper Millett decided to stop the Jetta using a ruse in order to retrieve the cash, and elicit any other information that might be helpful, while preserving the confidentiality of the drug investigation.

Trooper Millett saw that a car (completely unrelated) was driving close behind the black Jetta. Using that fact, he stopped both cars on the pretext that he had observed an incident of road rage. To further the pretext, Trooper Millett first approached the unrelated car and obtained that driver's license and registration. He also asked the driver of that car to wait. Trooper Millett then approached the black Jetta. After obtaining the defendant's license and registration, Trooper Millett asked the defendant and Nuck to get out of the car, and pat frisked them. He removed the $2,200 wrapped with a rubber band from one of the defendant's pockets, plus $400 in loose cash from another. He removed the $1,800 wrapped with a rubber band from Nuck's pocket. Trooper Millett asked about the

_____

[7] The term is apparently derived from the phrase "to rip off."

[8] Although Trooper Millett was a member of the joint investigation team, he was working a detail at Logan Airport when he heard the broadcast. He left that detail and arrived at the scene "quickly."

large amount of cash he had found, and the defendant told him that it was for rent.  Nuck said that he intended to buy a vehicle.  Trooper Millett returned the $400 to the defendant, but kept the two rubber-banded bundles of cash.

Agitation and invention ensued.  According to Trooper Millett, both men became very concerned by the fact that he had taken the money.  He explained to them that he "would just start a civil forfeiture proceeding for the money."  Because they continued to protest, Trooper Millett gave them a receipt, which he signed "Trooper J. Edgar Hoover."[9]  When those steps were not enough to appease the defendant and Nuck, Trooper Millett told them that they could go to the State police barracks in Danvers to complain.[10]

Outrage overtaking caution, the defendant and Nuck accepted the trooper's invitation and went to the barracks to report what they believed was a "shake-down" by a rogue State police trooper.  They were met by Lieutenant Hughes of the State police

_____

[9] Trooper Millett explained that he used Mr. Hoover's name "because it was the feds['] money, and I thought that it would be a -- sort of a -- one way to explain who was actually taking the money without actually giving up who was taking their money, so I wrote Trooper J. Edgar Hoover."

[10] Another officer -- who was not involved in the investigation and knew nothing about the reason for the pretextual traffic stop -- happened upon the scene and stopped to act as backup for Trooper Millett.  That officer was understandably puzzled by Trooper Millett's actions, but did nothing to intervene.

who had been alerted ahead of time to the situation by Trooper Millett. Lieutenant Hughes knew of the joint drug operation, and wanted to maintain its confidentiality. At the same time, he wanted to try to obtain information from the defendant that might be helpful to the drug investigation. The lieutenant, therefore, invented a sham investigation into Trooper Millett's conduct as a pretext to interview the defendant, and told the defendant that "we were looking into the -- the seizure of the cash and the appropriateness of the Trooper's actions." In fact, no such investigation was afoot or intended.

The defendant agreed to return to the barracks the next day to be interviewed as part of the supposed investigation. That interview was conducted by Lieutenant Hughes and FBI Special Agent Wood, and they together maintained the fiction that they were conducting an investigation into Trooper Millett. The interview lasted about one-half hour.[11] After eliciting details about the stop, the frisk, the removal of the money, and the receipt, Special Agent Wood asked:

> "Now, just for our clarification, so we can show in Court if we have to which -- where did you get your -- your money from, like the -- all the money, so we can prove that this is your money?

The defendant initially responded that it came from "my trust" and that he had earned it while "working under the table."

---

[11] The recording of the interview was played for the jury.

Special Agent Wood asked whether the defendant could provide receipts, and the defendant said that he would be able to provide bank statements. Special Agent Wood asked that the statements be sent to him, and the defendant agreed. In response to further questioning, the defendant stated that he was going to use the money to buy a car. Later in the interview, the officers returned to the topic of the source of the money:

Hughes: "Okay. So that money that you had, was from your bank accounts --"

The defendant: "Yeah. It's -- yeah. That's money --"

Hughes: "-- it wasn't from a job?"

The defendant: "No, that's money I've -- I've been had. I have had the money."

Hughes: "You had that money?"

The defendant: "Yeah. Correct."

Hughes: "So you -- okay, so you haven't been working since April?

The defendant: "Well, no, I have been working under the table here and there."

Hughes: "All right. Doing what?"

The defendant: "Yeah, I would rather not say because it's under the table. I don't want to like put my --"

Hughes: "You don't have to tell us --"

The defendant: "-- employer in a funny position."

Hughes: "-- you don't have to tell us who your employer is, but what were you -- what were you doing?"

The defendant: "Oh, what was I doing?  I was fishing."

Discussion.  After a three-day trial in 2012, the defendant was convicted by a jury of larceny by means of false pretenses over $250, in violation of G. L. c. 266, § 30, for stealing money belonging to the FBI.  He also was convicted of misleading a police officer with the intent to impede, obstruct, or otherwise interfere with a criminal investigation, in violation of G. L. c. 268, § 13B.[12]  This charge was based on the defendant's false statements about where he got the money when he was interviewed by Lieutenant Hughes and Special Agent Wood as part of their sham investigation into Trooper Millett.

1.  Larceny by false pretenses.[13]  "Prosecution for larceny by false pretenses requires proof that (1) a false statement of fact was made; (2) the defendant knew or believed that the statement was false when he made it; (3) the defendant intended that the person to whom he made the false statement would rely

---

[12] The defendant was sentenced to consecutive prison terms of from three to five years for larceny and from one to one and one-half years for misleading a police officer or Federal agent.

[13] The defendant was charged with violating G. L. c. 266, § 30(1), as amended by St. 1987, c. 468, § 1, which provides, as pertinent here, "[w]hoever steals, or with intent to defraud obtains by a false pretense, . . . the property of another . . . shall be guilty of larceny."

on it; and (4) the person to whom the false statement was made did rely on it and, consequently, parted with property." Commonwealth v. Cheromcka, 66 Mass. App. Ct. 771, 776 (2006), quoting from Commonwealth v. Williams, 63 Mass. App. Ct. 615, 620 (2005).[14] "Property" includes money.  G. L. c. 266, § 30(2). A "larceny [i]s complete if and when the money, pursuant to a fraudulent scheme, [comes] under the defendant's control." Commonwealth v. Ellison, 5 Mass. App. Ct. 862, 862 (1977).  That point may have occurred in this case as early as when Olive handed the money to the defendant almost immediately after he got into the back seat of Olive's car, but certainly had occurred by the time he left Olive's car.

As we have noted, the crime requires proof that the defendant made a false statement of fact.[15]  "A false pretense

---

[14] Our cases uniformly use this formulation of the elements of the crime.  See Commonwealth v. Green, 326 Mass. 344, 348 (1950); Commonwealth v. McCauliff, 461 Mass. 635, 641-642 (2012); Commonwealth v. St. Hilaire, 470 Mass. 338, 346 n.12 (2015); Commonwealth v. Edgerly, 6 Mass. App. Ct. 241, 262 (1978); Commonwealth v. Reske, 43 Mass. App. Ct. 522, 524 (1997).

[15] For reasons that are unexplained in the record, the jury instructions in this case were not consistent with our caselaw nor with the Criminal Model Jury Instructions for Use in the District Court (2009).  The judge incorrectly instructed that the first element required the Commonwealth to prove that the defendant "promised to provide the person known as Olive with a thing of value."  Instead, the Commonwealth was required to prove that the defendant made a false statement of fact.  See text, supra, and accompanying note 14.  The record does not reveal the source of the judge's erroneous language, and neither

may be made by implication as well as by verbal declaration," and it "may consist of an act, symbol, or token calculated to deceive." Commonwealth v. Reske, 43 Mass. App. Ct. 522, 525-526 (1997). But "[t]he pretence must relate to past events. Any representation or assurance in relation to a future transaction, may be a promise or covenant or warranty, but cannot amount to a statutory false pretense." Commonwealth v. Drew, 19 Pick. 179, 185 (1837). "A mere failure to fulfil a promise does not constitute a misrepresentation." Commonwealth v. Cheromcka, 66 Mass. App. Ct. at 782.

For the reasons that follow, we disagree with the defendant's argument that there was insufficient evidence that (a) he made a false statement of fact (b) with the requisite scienter.[16] However, we agree with his argument that the erroneous admission of the gist of Olive's first conversation with the defendant, as recounted by Special Agent Wood, was not harmless beyond a reasonable doubt.

_____

party objected to it, either before or after the instructions were delivered. Although the instructions, as given, did not properly describe the crime, neither party raises any issue concerning the instructions on appeal. We accordingly do not rest our decision on the error. In any event, our outcome would be unaffected, and we assume that the error will not be repeated in any retrial.

[16] The defendant does not challenge the sufficiency of the Commonwealth's proof with respect to the third and fourth elements.

We begin by noting that Olive did not testify.  Thus, although there appears to have been a conversation between Olive and the defendant before the one in which they agreed to meet on Franklin Street, its contents were, as the Commonwealth concedes, inadmissible hearsay.  The judge correctly sustained the defendant's objections to Special Agent Wood's testimony directly stating what Olive told him about that initial conversation.[17]  However, Special Agent Wood was nonetheless permitted to testify to the gist of that conversation, namely that the defendant told Olive that he would sell her two ounces

---

[17] We set out the objected-to testimony here:

Q.:  ". . . Now, this particular morning or day, sir, how did you go about setting up this particular controlled purchase -- attempted control[led] purchase?"

Special Agent Wood:  "The -- Olive had contacted me and said that [the defendant] was --"

Defense counsel:  "Objection."

The court:  "I'll sustain the objection."

Q.:  "Without -- without getting into what anybody else said, sir, what did you actually do?"

Special Agent Wood:  "Oh, I met with cooperating -- I met with Olive at my office.  I had Olive make a consensually recorded telephone call to [the defendant].  Upon ending the con -- the conversation, we knew that it -- [the defendant] planned to sell --"

Defense counsel:  "Objection."

The court:  "Yeah, I'll sustain it."

of crack cocaine in exchange for $2,200 and thirty grams of heroin in exchange for $1,800. The Commonwealth acknowledges that the substance of Olive's initial conversation was testimonial and that its admission through Special Agent Wood, rather than through Olive, implicated the defendant's confrontation rights. The error was preserved. Accordingly, the question is whether the error was harmless beyond a reasonable doubt. Commonwealth v. Montoya, 464 Mass. 566, 571-572 (2013).

"When analyzing whether an error was harmless beyond a reasonable doubt, we consider whether, based on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts. It is not enough that other, properly admitted evidence was sufficient to convict the defendant or that the inadmissible evidence was consistent with the admissible evidence. An error is harmless beyond a reasonable doubt only when other properly admitted evidence of guilt is overwhelming, in the sense that it is so powerful as to nullify any effect that the improperly admitted evidence might have had on the fact finder or the findings"(quotations and citations omitted). Ibid.

Here, the properly-admitted evidence was sufficient to prove that the defendant made a false statement of fact for purposes of the larceny charge, but that evidence was far from overwhelming. The only direct evidence of the defendant's statements was: (1) "instead come scoop me on Franklin," (2) "Yeah, Franklin Street. You know Franklin Street, right? Call me when you're on Franklin Street. I will come out -- I will come outside," (3) "All right. Cool good. Count it out," (4) "So this -- this right here, this is 22, and this right here is 18," and (5) "See you right back." The first three of these were not representations of fact. Moreover, there was no evidence that the defendant knew any of the first four statements was false. Indeed, the defendant met Olive on Franklin Street as he had proposed, and there were in fact two bundles of cash, one containing $2,200 and the other $1,800. The question therefore reduces to whether the fifth statement, "See you right back," was a false statement of fact.[18]

"See you right back" is a promise. Generally, our cases have held that a promise of future performance is not a false

---

[18] Although there was circumstantial evidence that Olive and the defendant made an agreement to conduct a transaction of some sort once they met at Franklin Street, and that Olive relied on that agreement when she gave the money to the defendant and allowed him to leave the car with it, that evidence was not sufficient to prove a particular verbal statement, "act, symbol, or token calculated to deceive" by the defendant without resorting to impermissible speculation. Commonwealth v. Reske, 43 Mass. App. Ct. at 525.

statement of fact.  See Commonwealth v. Drew, 19 Pick. at 185;

Commonwealth v. Cheromcka, 66 Mass. App. Ct. at 782.  A helpful

discussion of this point, and the reasons for it, is contained

in Commonwealth v. Drew, 19 Pick. at 184-185:

> "What is a false pretense, within the meaning of the statute?  It may be defined to be a representation of some fact or circumstance, calculated to mislead, which is not true.  To give it a criminal character there must be a scienter and a fraudulent intent. . . .
>
> "It is not the policy of the law to punish criminally mere private wrongs.  And the statute may not regard naked lies, as false pretenses.  It requires some artifice, some deceptive contrivance, which will be likely to mislead a person or throw him off his guard. . . .
>
> "The pretence must relate to past events.  Any representation or assurance in relation to a future transaction, may be a promise or covenant or warranty, but cannot amount to a statutory false pretense.  They afford an opportunity for inquiring into their truth, and there is a remedy for their breach, but it is not by a criminal prosecution."

Although a promise of future performance alone cannot

constitute a false statement of fact for purposes of the

larceny statute, it can do so if it is accompanied by a

false statement of past fact, whether express or implied.

See id. at 185; Commonwealth v. True, 16 Mass. App. Ct.

709, 711-713 (1983) (reversing conviction where

insufficient evidence that factual statements made in

purchase and sale agreement were false at time made);

Commonwealth v. Cheromcka, 66 Mass. App. Ct. at 781

(defendant's approval of credit card bills that were submitted to school district for payment contained implied misrepresentation that items that had been purchased in past were for school use).

Here, the statement, "See you right back," contained an implied representation of fact that the drugs the defendant had promised to sell were nearby.  However, that implied representation rested in large -- and almost exclusive -- part on the inadmissible evidence that the defendant had agreed to sell drugs to Olive.  Without the testimony about the gist of Olive's initial conversation -- the communication that set the entire transaction in motion -- the statement, "See you right back," was not sufficient to constitute a false representation of fact.

For these reasons, we conclude that the erroneous admission of the substance of Olive's initial conversation with the defendant was not harmless beyond a reasonable doubt, but that there was sufficient evidence to permit a retrial.[19]  See Kater

---

[19] Although we are unable to tell from the trial record whether the Commonwealth would call Olive to testify at a retrial, for purposes of determining whether the evidence would be sufficient on retrial, we may assume that it would.  See Commonwealth v. Sepheus, 468 Mass. 160, 173 (2014) ("We are not able to determine from the trial record whether the Commonwealth would call the informant to testify at a retrial to offer competent testimony that the defendant had been selling crack cocaine for purposes of supporting an inference that he intended to sell the three rocks of crack cocaine that he had on his

v. Commonwealth, 421 Mass. 17, 18 (1995) (Commonwealth is entitled to retrial if evidence, including inadmissible evidence, was sufficient to send case to jury); Commonwealth v. Hanson, 79 Mass. App. Ct. 233, 234-235 (2011).

Turning to the element of scienter, there was ample evidence from which a jury could find, beyond a reasonable doubt, that the defendant's actions and statements were intended to lull Olive into believing that he intended to sell her drugs, when in fact he did not intend to do so. See Commonwealth v. Cheromcka, 66 Mass. App. Ct. at 782 (defendant cannot be convicted "absent proof of an intention to deprive at the time of the representation"). Although the fact that the sale did not ultimately occur is not enough alone to prove scienter, Commonwealth v. McCauliff, 461 Mass. 635, 642 (2012) ("the lack of sale, by itself, does not give rise to a permissible inference that no sale of the property was ever intended"), here there was additional evidence of the defendant's intent.

To begin with, as Olive herself noted, Nuck's presence at the scene was an indication that the sale would not happen as arranged. Olive commented on this immediately, and she became optimistic about the prospects of a sale only when she saw Nuck

person. If it does, this could be sufficient, with the other evidence, to allow the case to go to the jury"). Furthermore, the record suggests that the initial conversation was recorded and, if that is the case, the Commonwealth could introduce that recording.

leave and thought she would be able to conduct the transaction with the defendant alone. That optimism rested on a false impression created by the defendant and Nuck; in fact, the defendant and Nuck reunited once out of Olive's sight. In addition, Olive was told to drive to a location that was close to the defendant's car, but from which his car was not visible. It is a fair inference that the defendant did not wish Olive to see where he went when he left her car, nor did he want her to know that he planned to drive away. If no subterfuge were involved, then one would expect Olive to drop the defendant and Nuck near or next to the car they intended to use, rather than on another block. There was no obvious reason for Olive to have been told to park on Arlington Street because that was not where the drugs were located. In addition, if, as the defendant stated, he would "[s]ee [Olive] right back," there would have been no reason for Nuck to return to retrieve the telephone that had been left behind, particularly since more than two minutes had already elapsed. In addition, the defendant and Nuck gave each other a "high five" once they emerged on the parallel street and were out of Olive's view. Based on common knowledge, one can reasonably infer that the gesture was a sign of mutual congratulation. Although the object of that congratulation is not self-evident, it was open to the jury to determine that it reflected pleasure, albeit premature, at duping Olive. Finally,

although the defendant was stopped "quickly" after he drove away, the jury could conclude, based on the evidence we have already recited, that -- even had he not been stopped by Trooper Millett -- he was far enough away to suggest that it was not his intention to return to consummate the sale.

In sum, we conclude that there was sufficient evidence that the defendant made a false statement of fact with the requisite scienter, but that the admissible evidence of that statement was not so overwhelming as to nullify any effect the improperly admitted evidence might have had on the jury.

2. Misleading a police officer. The indictment charged the defendant with "willfully mislead[ing] another person who is a police officer or federal agent with the intent to impede, obstruct or otherwise interfere with a criminal investigation," in violation of G. L. c. 268, § 13B, as it existed at the time of the offense.[20] The Commonwealth's theory at trial was that the defendant had violated the statute by lying about the source of the money when he was interviewed by Lieutenant Hughes and Special Agent Wood. The defendant made those statements thinking that he was participating in an investigation he had

---

[20] Although subsequently expanded in 2010 to encompass civil proceedings, at the time of the conduct at issue in this case, the statute prohibited only interference with "a criminal investigation, grand jury proceeding, trial or other criminal proceeding." G. L. c. 268, § 13B(1)(c)(v), as amended by St. 2006, c. 48, § 3.

been led to believe was being conducted into Trooper Millett. Not only was that investigation a sham, Trooper Millett's conduct itself was a ruse. In reality, the defendant was the unwitting subject of an elaborate fabrication designed to elicit self-incriminating statements that would benefit a drug investigation about which he had no inkling and about which law enforcement wanted him kept in the dark.[21]

The defendant argues that his conviction should be reversed because (1) there was insufficient evidence of a criminal investigation because the investigation was a sham, and (2) the evidence was insufficient to prove that he acted with the requisite intent.[22]

General Laws c. 268, § 13B, is "fundamentally a 'witness intimidation statute'" and is "concerned primarily with

---

[21] As the prosecutor stated in closing argument:

"And clearly [the ruse] worked perfectly because [the defendant], when he makes that statement to [Lieutenant] Hughes and Agent Wood the next day, has no idea -- has no idea why he was stopped by Trooper Millett. He has no idea that it was because he took that [$]2200 and $1800 from Olive. He really thought -- he really thought that Trooper Millett was shaking him down for money. He really believed that. He had no idea that he got stopped because he just stole this money from a Federal informant."

[22] Because we conclude that the evidence was insufficient to prove a "criminal investigation" within the meaning of the statute, we do not reach the defendant's additional arguments that it would be unfair to criminalize the behavior at issue here and that the statute, on its face and as applied, is unconstitutionally vague.

countering the effect of witness intimidation on the successful prosecution of criminals." Commonwealth v. Morse, 468 Mass. 360, 367 (2014).  However, the statute was expanded in 2006 to "outlaw[] 'mislead[ing]' and 'harrass[ing]' conduct, in addition to the 'threatening' and 'intimidating' conduct that the prior version of the statute had proscribed."  Id. at 369, quoting from G. L. c. 268, § 13B.  We are concerned here only with the "misleading" prong of the statute, which prohibits directly or indirectly (1) wilfully misleading (2) a police officer, Federal agent, or investigator (3) "with the intent to impede, obstruct, delay, harm, punish, or otherwise interfere thereby with a criminal investigation."  G. L. c. 268, § 13B(1)(c).

For purposes of the statute, the Supreme Judicial Court has adopted the Federal definition of "misleading conduct" as used in 18 U.S.C. § 1512(b) (2006):

> "(A) knowingly making a false statement; (B) intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby creating a false impression by such statement; (C) with intent to mislead, knowingly submitting or inviting reliance on a writing or recording that is false, forged, altered, or otherwise lacking in authenticity; (D) with intent to mislead, knowingly submitting or inviting reliance on a sample, specimen, map, photograph, boundary mark, or other object that is misleading in a material respect; or (E) knowingly using a trick, scheme, or device with intent to mislead."

Commonwealth v. Figueroa, 464 Mass. 365, 372 (2013),
quoting from 18 U.S.C. § 1515(a)(3) (2006).[23]

"Each aspect of the definition adopted suggests a knowing
or intentional act calculated to lead another person astray.
Objectively misleading conduct, as defined, is not enough,
however, to establish the offense.  In addition to the
requirement that there be knowing or intentional conduct that is
objectively misleading as defined, a statutory violation is not
established unless there is also proof of a defendant's specific
intent to 'impede, obstruct, delay, harm, punish, or otherwise
interfere thereby' with a criminal investigation."  Commonwealth
v. Morse, 468 Mass. at 372, quoting from G. L. c. 268,
§ 13B(1)(c)(v).  "[S]uch specific intent has been ascertained
inferentially from a defendant's affirmative misrepresentations,
plainly and demonstrably false, to law enforcement authorities."
Id. at 373.  Where a defendant's statements satisfy the
definition of misleading conduct, and there is sufficient
evidence of his specific intent, "it does not matter that [the
defendant] fail[s] to succeed in misleading" his auditor.
Commonwealth v. Figueroa, 464 Mass. at 373.  See Commonwealth v.

---

[23] We are not here concerned with (C) or (D) because the
defendant is not accused of having provided a false or
misleading document, sample, writing, etc.  Nor is section (B)
at issue because the defendant is not accused of having omitted
information.  This case falls under (A), "knowingly making a
false statement."

Casiano, 70 Mass. App. Ct. 705, 709 (2007), quoting from Commonwealth v. Robinson, 444 Mass. 102, 109 (2005) ("the statute punishes anyone who 'wilfully endeavors' to intimidate a witness; it does not require that the intimidation be successful").

With these general principles in hand, we turn to the defendant's specific arguments.

a. Criminal investigation. We are persuaded that, on the unique facts presented here, there was insufficient evidence of a criminal investigation within the meaning of the statute as it existed at the time. The Legislature intended the statute to encompass "any investigation or proceeding that may result in criminal-type sanctions" (emphasis added). Commonwealth v. Figueroa, 464 Mass. at 370. This expansive definition does not require "[t]he government . . . to prove the exact nature of the criminal proceedings." Commonwealth v. Wiencis, 48 Mass. App. Ct. 688, 691 (2000). Indeed, the investigation need not have been commenced at the time of the defendant's statements, Commonwealth v. King, 69 Mass. App. Ct. 113, 121 (2007) (arising under "intimidation" branch of statute), nor need it be pending, Hrycenko v. Commonwealth, 459 Mass. 503, 509 (2011) (same). Even certain noncriminal investigations can fall within the statute provided they "may result in criminal-type sanctions." Commonwealth v. Figueroa, 464 Mass. at 370.

But a sham investigation into a fake crime is something different. Here, the investigation into Trooper Millett was an invention designed solely to elicit self-incriminatory statements from the defendant without providing any of the protections to which he might be entitled were the true purpose of the interrogation revealed. Not only did the investigation not exist, no such investigation was intended or contemplated. Nor could the investigation possibly "result in criminal-type sanctions," ibid., because Trooper Millett's actions were themselves a ruse. An invention piled upon a fabrication is not a "criminal investigation" within the meaning of the statute particularly where, as here, the only person who was, or could have been, led astray was the defendant. The relationship of the circumstances here "to the fundamental anti-witness-intimidation purpose of § 13B is at best attenuated." Commonwealth v. Morse, 468 Mass. at 375.

The Commonwealth argues that, although the investigation into Trooper Millett was a sham, the drug investigation was real and it was a "criminal investigation." This contention is inarguably true. But, as the Commonwealth agrees, the defendant knew nothing about that investigation and, indeed, was kept

deliberately in the dark about it. The defendant accordingly cannot be said to have formed an intent to interfere with it.[24]

In short, we conclude that the evidence was insufficient to prove the existence of a criminal investigation within the meaning of the statute.

b. Specific intent. Relying on Commonwealth v. Morse, supra, the defendant argues that there was insufficient evidence to prove his specific intent to mislead. In Morse, however, the defendant made no affirmative misrepresentation to police. Instead, he merely denied his guilt when questioned by officers. There was "no evidence of affirmative misdirection on the defendant's part. The defendant's statement, the simple word 'no,' was an exculpatory denial, not a content-laden fabrication designed to send police off course, thereby interfering with their investigation." Id. at 374. In those circumstances, the court held that there was insufficient evidence of the defendant's specific intent to mislead. Id. at 374-375.

Here, by contrast, there was evidence of "content-laden fabrication," not simply an exculpatory denial of wrongdoing.

---

[24] We do not intend to suggest that if law enforcement employs a ruse of any sort, the requirements of the statute are never met. Ruses are part of the customary cat-and-mouse dance of criminal investigations and nothing in this opinion should be read to restrict their use. The sole question we decide here is whether a nonexistent investigation into a nonexistent crime that will never result in criminal-type penalties is a "criminal investigation" within the meaning of G. L. c. 268, § 13B.

The defendant, having made the decision to go the police in order to reclaim money he had obtained in a planned drug transaction, decided to lie about the provenance of the funds even after having been informed that the information was needed to "show in Court."  His various explanations for the money were that it came from a trust, that it came from his bank accounts, and that it came from working under the table as a commercial fisherman.  These were affirmative misrepresentations the jury could reasonably conclude were made to send the police off course.  Had there been a criminal investigation within the meaning of the statute, the evidence of the defendant's intent to impede or interfere with it would have been sufficient.

Conclusion.  The defendant's convictions for larceny by false pretense, G. L. c. 266, § 30, and misleading a police officer, G. L. c. 268, § 13B, are reversed and the verdicts are set aside.  The case is remanded for further proceedings consistent with this opinion.

So ordered.