Following a jury-waived trial in the Superior Court, the defendant, Kathryn Christopher, was convicted of obtaining, by false pretenses, the signature of an eighty-eight year old woman suffering from end-stage Alzheimer's disease, in violation of G. L. c. 266, § 31. The defendant contends that the Commonwealth failed to prove that the signature was obtained by a false pretense or with the requisite intent to defraud, and thus the judge erred in denying her motion for a required finding of not guilty. We affirm.
Background. 1. Prior proceedings. The defendant was initially indicted on a charge of larceny from a person sixty-five years or older (indictment 2011-910-001) and three separate charges of obtaining a signature by false pretenses (indictments 2011-910-002 through -004). A jury trial commenced on October 22, 2012, during which the judge allowed the defendant's motion for a required finding of not guilty as to indictment 2011-910-002. Subsequently, the jury were unable to reach verdicts on the other indictments, and the judge declared a mistrial. Pending retrial, the defendant filed a motion to dismiss the three remaining indictments, which the judge denied. The defendant sought relief from a single justice of the Supreme Judicial Court pursuant to G. L. c. 211, § 3. In a written decision, the single justice allowed the petition as to indictments 2011-910-001 and -003, and dismissed those indictments, but denied the defendant's request to dismiss indictment 2011-910-004.[2] Accordingly, the defendant was retried on a single count of obtaining a signature on mortgage documents by false pretenses.
2. Facts. We briefly summarize the facts a rational fact finder could have found, reserving some details for later discussion. On December 29, 2002, Lieutenant David DeMarco of the Belmont fire department was dispatched to 65 Oliver Road in the town of Belmont, because of water and sewage in the basement and kitchen. Upon arrival, he met with the elderly owner of the home (the victim). Lieutenant DeMarco observed that the victim "appeared to live alone," was "vulnerable," and "needed assistance." Accordingly, he telephoned her the next day "to see how she was, if everything was going okay." His conversation with the victim was "odd" because she did not recall that the fire department had been to her home the previous day. Consequently, Lieutenant DeMarco contacted Lucia Stone, a social worker at the Belmont Council on Aging (BCA), to check on the victim and determine whether she needed assistance.
Upon receiving the information from Lieutenant DeMarco, Stone followed BCA practice and forwarded the referral to the defendant, who served as the "home care coordinator" at the BCA. It was the home care coordinator's responsibility to determine what home care services were needed, if any, and to "make an appropriate match" with a private health care provider. The private health care providers assigned to work with elders in need of services were not employees of the BCA. Additionally, the defendant, as a BCA employee, was forbidden to procure her own private clients introduced through her position as home care coordinator. Despite this restriction, the defendant took the victim on as her private client in late December, 2002, or early January, 2003. The defendant did not tell her supervisor of this arrangement with the victim, and the supervisor did not become aware of it until several years later, in 2007.
The defendant's arrangement with the victim set her wage at fifteen dollars per hour. The defendant was initially paid by personal check, but contended that "because [she] didn't want to claim the income," she was later paid "in the form of paying bills." In other words, the defendant took funds from the victim's accounts to pay her own bills. However, the defendant neither kept track of her accounts receivable from the victim nor maintained a separate bank account for her private client business.
As discussed infra, the evidence demonstrated that at all times relevant to the issues raised on appeal, the victim suffered from dementia and was mentally incapacitated. Prior to April of 2005, the victim was diagnosed with end-stage Alzheimer's dementia, and no later than July of 2005, she would not "have the ability to understand financial decisions" according to the chief of geriatric medicine at Spaulding Hospital.
In 2005 and 2006, the defendant arranged for the victim to change her will, and subsequently sign three mortgages on her home. The contested issues at trial were whether, at the time the October, 2006, mortgage was executed, the defendant obtained the victim's signature by false pretenses and with the intent to defraud her. There is no dispute that the evidence viewed in the light most favorable to the Commonwealth showed that the defendant knew of the victim's mental incapacity, used her hand to guide the victim's signature on the mortgage documents, and used the proceeds from the mortgage to pay personal bills and remodel the first and second floors (together, the upstairs) of the victim's home. There is also no dispute that the defendant moved herself and her family into the upstairs of the victim's home in or around October of 2006, and moved the wheelchair-bound victim into the basement.
Discussion. We review the denial of a motion for required finding of not guilty to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), quoting from Jackson v. Virginia, 443 U.S. 307, 318-319 (1979). See Mass.R.Crim.P. 25(a), as amended, 420 Mass. 1502 (1995). Reasonable inferences may be drawn from the evidence, Commonwealth v. Bush, 427 Mass. 26, 30 (1998), and "need only be reasonable and possible[, not] necessary or inescapable. Commonwealth v. Morgan, 449 Mass. 343, 349 (2007) (quotation omitted).
The statutory elements of the crime of obtaining a signature by false pretenses pursuant to G. L. c. 266, § 31, consist of "(1) obtaining the signature of a person to a written instrument; (2) the false making whereof would be a forgery; (3) by a false pretense; (4) with intent to defraud." Commonwealth v. Levin, 11 Mass. App. Ct. 482, 495 (1981). Here, the defendant challenges the sufficiency of the third and fourth elements only.
Contrary to the defendant's claim, the totality of evidence presented at trial satisfied the elements of false pretense and intent to defraud beyond a reasonable doubt. A rational fact finder could have found, inter alia, as follows. First, the defendant took on the victim as a private client in late 2002 despite being precluded from doing so by the BCA. The defendant hid this information from her supervisor for years.
No later than April of 2004, the defendant took active steps to assist the victim in changing her estate planning documents. Despite being advised by the victim's physician, Dr. Fuller, that the victim should see a neurologist before executing legal documents, no such step was taken.
On April 9, 2005, the victim was admitted to Mount Auburn Hospital due to congestive heart failure. That day, psychiatrist Astrid Desrosiers evaluated the victim while the defendant was present as her health care proxy. Dr. Desrosiers formed the professional opinion that the victim was incompetent. This conclusion was based, in part, on the defendant's statement that the victim was confused and that there had been a progressive decline in her condition. Indeed, the evidence demonstrated that the defendant was well aware by this time that the victim suffered from dementia and had been diagnosed with Alzheimer's disease.
On July 8, 2005, the victim was admitted to the psychiatric unit at Mount Auburn Hospital by the defendant, who falsely represented herself as the victim's "niece." A progress note from July 11 stated that the victim would not "be appropriate for further intervention at this time due to the patient's severe dementia. Significant cognitive impairment so is not able to participate in or benefit from treatment."[3] A rational fact finder could have found that the defendant knew in 2005, and at the time of the signing of the mortgage documents in 2006, of the victim's mental incapacity and inability to consent to the transaction at issue in this case.[4]
With this intimate knowledge of the victim's readily apparent mental incapacity, the defendant continued to engage in what a rational fact finder could have viewed as a pattern of manipulative and deceitful conduct vis-à-vis the victim. In July, 2005, shortly after the victim had been discharged from Mount Auburn Hospital, the defendant assisted the victim in obtaining a $200,000 mortgage on her home from H & R Block. After the mortgage was executed, the defendant took the victim to Cambridge Savings Bank where she and the victim opened a joint account in both of their names. Bank records introduced at trial showed that between November 25, 2005, and April 9, 2007, approximately twenty money orders were issued, through which thousands of dollars were effectively withdrawn from the joint account and deposited into the defendant's checking account at the Winchester Cooperative Bank.[5]
From December, 2005, to October, 2006, there were a series of further hospitalizations in which the victim exhibited similar symptoms to her July, 2005, hospitalization. In July or August of 2006, the defendant enlisted the services of Attorney Pasquale Scavitti to assist with the refinance of the victim's property. Scavitti "was told [by a mortgage broker] to reach out to [the defendant] as the contact person relative to the refinance for her elderly aunt." The defendant represented to Scavitti that the purpose of the refinance was to make modifications to the property "as it related to accommodations for [the victim]." On August 21, 2006, Scavitti met with the defendant and the victim and executed paperwork for another mortgage.[6]
In October, 2006, the defendant reenlisted the services of Attorney Scavitti for yet another mortgage. The October, 2006, mortgage closing was held in a visiting room at the rehabilitation center where the victim was staying following her release from another stay at Mount Auburn Hospital. The mortgage was in the amount of $461,250, which, after paying off the August, 2006, mortgage, resulted in a net balance of approximately $184,000. The net balance was then deposited into the joint account at Cambridge Savings Bank.
A rational fact finder could have found, inter alia, that the defendant falsely represented herself to Attorney Scavitti (and by inference to the victim), as the victim's "niece" before and at the time of the signing of the October, 2006, mortgage documents.[7] Furthermore, the defendant represented that the purpose of the October mortgage was "to do some modifications to the [victim's] house to make it more accessible for her physical disabilities." The evidence showed that no such modifications were made on the victim's behalf, and that no such modifications were ever intended to be made. To the contrary, although the victim was wheelchair bound and unable to reach the upstairs living areas of the home, the renovation plans omitted any means of wheelchair access to those areas.[8] Moreover, none of the upstairs renovations, which included work on the kitchen and several bedrooms, were designed to make those spaces more handicapped-friendly.[9] Thus, a rational fact finder could have determined that, far from using the proceeds of the mortgage to make the home accessible to the victim, the defendant intended to and did use proceeds to improve the home in ways that would benefit only herself and her family.
Finally, the Commonwealth introduced evidence that money from the October, 2006, mortgage was also used to pay the defendant's expenses, including but not limited to her children's college tuition. The judge, as fact finder, was free to disbelieve the defendant's claim that the she was paid for her care of the victim "in the form of paying bills." Instead, the judge could have found, particularly in the absence of any record-keeping by the defendant, that the defendant used the victim's funds as her personal spending account.
The evidence summarized above warranted the inferences that the defendant (1) saw the victim as an easy mark from the outset, (2) knew of the victim's mental incapacity, (3) falsely represented that the purpose of the October, 2006, mortgage was to make the victim's home handicapped-accessible when, in fact, it was for her own personal use, and (4) guided the victim's signature during the closing of that mortgage. Through this evidence, a rational finder of fact could have concluded that the defendant obtained the victim's signature by a false pretense and with intent to defraud. See Commonwealth v. Morrison, 252 Mass. 116, 122 (1925) ; Commonwealth v. Reske, 43 Mass. App. Ct. 522, 525-526 (1997). "It is not necessary to have direct evidence that a representation was false. It is enough if all the circumstances considered together would warrant the [fact finder] in concluding that it was untrue." Morrison, supra at 122-123.
The defendant responds that contrary to the judge's conclusion, the evidence showed that the victim had repeatedly requested to stay in her home rather than a hospital or elder care facility, that her assistance with signing the mortgage was effectuated solely to honor the victim's stated wishes, and that there was no evidence of any false statement made by her to the victim. She further claims that although the facts may show poor judgment, they do not constitute a crime. We disagree. The defendant takes a far too narrow view of "false pretense" as that element has been explicated in our case law. First, her argument ignores well-established precedent holding that "[a] false pretense may be made by implication as well as by verbal declaration." Reske, supra. See Morrison, supra at 122 ("False representations may be made by acts as well as words"). As in Reske, this case involved a mentally incapacitated victim and a defendant who exploited the victim's condition for personal gain. Second, viewing the evidence in its totality, including the timing of the defendant's actions, the false representations as to her relationship to the victim and the purpose of the mortgage, and the rapidity with which she engineered the procurement of the victim's money and home, the judge did not err in finding a false pretense and intent to defraud.[10] See Commonwealth v. McHugh, 316 Mass. 15, 22 (1944). See also Commonwealth v. Khan, 92 Mass. App. Ct. 487, 493-494 (2017) (intent may be inferred from defendant's knowledge and subsequent participation in offense viewing totality of evidenced presented).
We similarly reject the defendant's argument that, having already convinced the victim to name her as heir in the victim's will, she had nothing to gain by the mortgage and thus no intent to defraud. Her false statements regarding the purpose of the mortgage and the relationship to the victim demonstrate otherwise. Moreover, a fact finder could reasonably infer that the defendant wanted to reach the equity in the victim's home immediately and not wait or risk the possibility that the home might be reached by a creditor or that some authority might notice the defendant's action and cause a challenge to the validity of that will. This is not a case in which a fact finder would need to rely on conjecture and pile inference upon inference to find the defendant guilty beyond a reasonable doubt. See Commonwealth v. Ferguson, 384 Mass. 13, 18 (1981). The Commonwealth's case was strong and the inferences drawn by the judge were warranted from the evidence.
Judgment affirmed.

In denying the request to dismiss indictment 2001-910-004, the single justice stated, in relevant part:
"The defendant's petition is denied as to [indictment] 4, which again alleged that, on or about October 28, 2006, she induced [the victim] to sign a mortgage for $450,000 despite knowing that [the victim] had been suffering from Alzheimer's disease and dementia for years. The evidence showed that the defendant was aware of [the victim]'s mental incapacity; that she used her hand to guide [the victim]'s signature; that she took the proceeds from the mortgage to open a joint bank account with [the victim]; and that she used that account for her own personal needs. The evidence was sufficient to survive a motion for a required finding."

The Commonwealth introduced overwhelming evidence that the victim suffered from dementia at the time of the signing of the October, 2006, mortgage documents, and that the defendant was keenly aware of the victim's condition prior to and at the time of the signing of the 2006 mortgages. The victim had been diagnosed with end-stage Alzheimer's disease more than eighteen months before the October, 2006, mortgage closing. Dr. Desrosiers testified that during the April 9, 2005, evaluation, the victim could not remember the defendant's last name; that the victim was confused and could not process information; that the victim's diagnosis was Alzheimer's dementia ; and that the victim was not competent. Dr. Bonnell, chief of geriatrics at Spaulding Hospital, testified that in July, 2005, the victim would not have the ability to understand financial decisions. Dr. Bonnell testified that a note in the victim's medical records from April of 2005 indicated that she was unable to provide any information pertaining to her family history. In addition, numerous witnesses described the victim's symptoms and made observations, which further corroborated the experts' medical conclusions.

The defendant cites Commonwealth v. St. Hilaire, 470 Mass. 338, 348 (2015), for the proposition that it is not enough for the Commonwealth to prove that the victim suffered from diminished capacity, and that it must also prove that the perpetrator knew of the victim's inability to consent to the transaction at issue. It is unclear whether the defendant is contending that the judge applied an incorrect legal standard, or that the Commonwealth failed to satisfy its burden of proving that the defendant knew of the victim's mental incapacity. In either case, there was no error. The judge accurately summarized the legal standard in St. Hilaire, and found that the Commonwealth had sustained its burden of proof. The record supports the judge's determination, as there was abundant evidence that the defendant knew that the victim lacked the mental capacity to consent to the mortgage transaction.

The money orders were all signed by the defendant, which, combined with other evidence and exhibits admitted at trial, permitted the inference that the funds were deposited into the defendant's Winchester Cooperative Bank account.

Attorney Scavitti referred to the August, 2006, mortgage as a "refinance." There was evidence at trial that this mortgage refinanced the 2005 mortgage.

Several witnesses, including health care practitioners, a contractor, and attorneys testified that the defendant referred to herself as the victim's "niece" or "daughter," or referenced the victim as "her aunt." Viewed in the light most favorable to the Commonwealth, these representations were part and parcel of the defendant's scheme to exaggerate and misrepresent the scope and nature of her relationship with the victim.

Instead, when the defendant and her family moved in to the home in October, 2006, the victim was relegated to the basement, which is at ground level. Although a friend of the defendant's son performed some work on the basement in 2007, the "finished" product was not designed as a handicapped-friendly space. It included a bedroom and a sink, but no toilet.

A contractor hired to work on the renovation testified that there are minimum requirements "as far as door widths and stair widths," among other things, to make a building handicapped accessible, and that none of those requirements were met in the renovation plan.

A rational fact finder could also view the defendant's concealment of her work with the victim from her BCA supervisor as consciousness of guilt. See Commonwealth v. Booker, 386 Mass. 466, 471 (1982).